**NORTH SHELBY WATER COMPANY, Plaintiff,**

v.

**SHELBYVILLE MUNICIPAL WATER AND SEWER COMMISSION, Defendant.**

Civ. A. No. 89–42.

United States District Court, E.D. Kentucky, Frankfort Division.

March 25, 1992.

Donald T. Prather, Shelbyville, Ky., for plaintiff.

Frank F. Chuppe, of Wyatt, Tarrant & Combs, Louisville, Ky., for defendant.

### MEMORANDUM OPINION

PATTERSON, United States Magistrate Judge.

The essential question presented is whether the previous installation by a rural water company of water distribution lines near to, or within, certain real estate later developed as residential subdivisions constitutes service "made available" to such property within the meaning of 7 U.S.C. § 1926(b), entitling the company to injunctive relief enjoining a municipal water system from providing water service to those

subdivisions. Upon the facts presented at the trial of this action, and under applicable law, declaratory and injunctive relief is appropriate.

Plaintiff, North Shelby Water Company ("North Shelby"), a non-profit Kentucky corporation organized in 1968, supplies water primarily to rural customers residing in certain portions of northern Shelby County, northwestern Franklin County, southern Henry County, and southern Oldham County, Kentucky. On May 18, 1989, North Shelby filed this action for declaratory and injunctive relief pursuant to 7 U.S.C. § 1926(b) against Defendant, Shelbyville Municipal Water and Sewer Commission ("the Commission"). The Court has jurisdiction of North Shelby's federal claims pursuant to 28 U.S.C. § 1331. Alternatively, Plaintiff asserts state law claims for declaratory and injunctive relief in regard to North Shelby's asserted "dominant right" under Kentucky law to provide water service to the areas in question.

This action was tried before the undersigned, without a jury, and pursuant to the parties' consent, 28 U.S.C. § 636(c)(1), on March 25–27, 1991. Evidence was presented solely in regard to North Shelby's federal claims, as the state law claims were bifurcated and reserved for later disposition [Record No. 73]. Following the preparation and filing of the transcript of the trial [Record Nos. 86–88], and the filing by the parties of their post-trial memoranda [Record Nos. 90–93], this matter has been submitted for decision.

Most of the essential facts are not in dispute. Rather, the parties disagree as to the interpretation of applicable law to be applied to those facts. For purposes of analysis, it is necessary to recount the relevant facts in some detail.

In 1971, North Shelby obtained a loan of $1,500,000.00 [1] from the Farmers Home Administration to finance the construction and installation of a rural water distribution system. That same year, and as required by applicable Kentucky law, North Shelby

obtained from the Public Service Commission of Kentucky ("PSC") a Certificate of Convenience and Necessity ("Certificate"), to construct and operate its proposed water distribution system "in the area as set forth in the application, plans and specifications filed in [the] record" [Plaintiff's Exhibit 2, p. 3]. The portions of North Shelby's water distribution system pertinent to this action are located in Shelby County, Kentucky, north and east of what were, in 1971, the city limits of the City of Shelbyville, Kentucky. While North Shelby's application to the PSC for a Certificate did not specify or draw any boundary lines for the area it proposed to serve, the application generally described its territory as "that area of Shelby County which is more than one mile north of U.S. Highway Number 60" [Plaintiff's Exhibit 3, p. 1, para. 2]. The specifications for the system prepared by North Shelby's engineer showed specifically where the water lines were to be located and where the water would be available to the prospective customers who had agreed to be served [Transcript of Trial, hereinafter "TR," pp. 32–33, 35–36].

After receiving the PSC Certificate approving the specific construction proposed, North Shelby proceeded with installation of its water system lines. Insofar as the location of those lines in relation to the farm land that was later subdivided and is the property which is in controversy in this action, those locations can best be understood by reference to various maps of record, along with the following narrative description. There are two general areas in dispute that were later subdivided. The facts pertinent to each will be outlined separately.

The first area, Brassfield and the Meadows Subdivisions, is highlighted in yellow ink on Plaintiff's Exhibit 7–A [TR, p. 63]. In 1971, as part of its initial system construction, North Shelby installed an 8" water line running northward alongside Highway 53 (shown by a green line on Plaintiff's Exhibit 7–A). North Shelby had earli-

---

**1.** Additional funding was subsequently obtained from the Farmers Home Administration, such that North Shelby's present indebtedness is in an approximate principal amount of $2,000,000.00 [*see* Plaintiff's Exhibits 1–A through 1–E].

er entered into a contract to purchase the Commission's water and North Shelby's line along Highway 53 connected with the Commission's system at the intersection of Highway 53 and Mary Ross Avenue and Seminole Drive [TR, p. 75; Plaintiff's Exhibits 4–A and 7–A]. From that point, North Shelby's line proceeds northerly along the east side of Highway 53, as shown by the green line marked on Plaintiff's Exhibit 7–A. As shown on that map, North Shelby's line crosses under Highway 53, to the west side thereof, and then continued northward.

Among North Shelby's original customers for that line were some farms that were later developed as residential subdivisions. As those subdivisions were being developed, some received water service from North Shelby (i.e., Glenview Subdivision, on the west side of Highway 53) while others were served by the Commission (i.e., Brentwood Subdivision on the east side of that highway) [TR, p. 58]. As to the subdivisions going north on the east side of Highway 53, but south of the eventual Brassfield/Meadows development, particularly Brentwood, adjacent to Mary Ross Lake and the golf course, North Shelby acquiesced in the Commission's provision of water service to those subdivisions. For the most part, as subdivisions developed northward along Highway 53, North Shelby served those on the west side of the road, while the Commission serviced those on the east side. It is assumed, as there was no testimony and the exhibits were not entirely clear, that the Commission has separate lines serving its customers in these subdivisions and those lines do not connect to North Shelby's line running northward adjacent to Highway 53.

The farm that eventually became Brassfield and the Meadows Subdivisions was one of North Shelby's original customers, with the residence for the farm, located on the east side of Highway 53, served by the North Shelby line located on the opposite side of Highway 53 at that point [TR, pp. 95–96]. That residence is served by a ¾" service line that runs under Highway 53 to the property [TR, p. 96]. The farm, which was about 135 acres, was purchased in 1978 by Mr. and Mrs. Whelan [TR, p. 97]. The location of the farm house is marked as "house" on Plaintiff's Exhibit 7–A.

In 1987, the farm began to be divided, and 2.46 acres thereof, which included the original farm house, was purchased by Kevin Morrey and his wife, and continues as a customer of North Shelby. The balance of the farm was purchased by others, and development of it began as Brassfield and the Meadows Subdivisions. On Plaintiff's Exhibit 11–A, the Morrey property is outlined in yellow, the Meadows Subdivision is outlined in pink, and the balance is the Brassfield Subdivision [TR, pp. 102–104]. At the time of the division of this property, North Shelby was providing water service to Glenview Subdivision, which is southwest of Brassfield, bounded on the north by Harrington Mill Road and on the east by Highway 53 [TR, pp. 106–107]. North Shelby also provides water services to Harrington Mill Estates, the entrance for which is Harrington Mill Road, directly across Highway 53 from the entrance into Brassfield [TR, p. 107]. Just prior to the beginning of the development of Brassfield, the Commission's water distribution facilities nearest to Brassfield and the Meadows are water lines located in Brentwood Subdivision, just south of Brassfield on the east side of Highway 53 [TR, pp. 108–109].

On September 23, 1988, the City of Shelbyville annexed all of the Whelan property, with the exception of the 2.46 acre Morrey tract [TR, p. 106]. The property annexed by the City is Brassfield and the Meadows Subdivisions. When fully developed, Brassfield will have 243 lots, of which 226 are for single family dwellings and 17 are single family townhouse lots, for a total of 243 dwelling units [TR, p. 109]. Plaintiff's Exhibit 11–B is the final plat for the first section of Brassfield's development, which contains 29 single family lots and 17 useable single family townhouses for a total of 46 dwelling units [TR, pp. 110–111]. The local Planning and Zoning Commission has at present given final approval only to Phase I of Brassfield and the remaining portions of Brassfield and all of the Mead-

ows have received only preliminary approval [Plaintiff's Exhibits 11–A, 11–B, 11–C; TR, pp. 392–393]. In order not to delay development of the subdivisions, the parties agreed that the Commission would provide water service for the initial development of Brassfield, without prejudice to the claims North Shelby asserts in this action. At the time of trial, four houses have been constructed in Section 1 of Brassfield [TR, p. 111].

As to the Meadows Subdivision, it has been divided preliminarily into 12 multi-unit lots for a total of 196 dwelling units [TR, p. 109]. No actual construction has occurred as to the Meadows, and the multi-family plans could be changed [TR, pp. 109–110]. The local Planning and Zoning Commission has only given preliminary, but not yet final, approval of that subdivision. How quickly Brassfield and the Meadows would actually be developed was unknown by any witness, although all agreed that full development would take many years. When fully developed, Brassfield and the Meadows will have a total of 439 dwelling units [TR, p. 109].

North Shelby's consulting engineer, Warner A. Broughman, III, estimated in late 1988 or early 1989 that if North Shelby were to serve Brassfield Subdivision only, when fully developed, it would yield gross revenue of more than $1,200,000.00 over a 20–year period [TR, pp. 128, 178]. Of that amount, approximately $400,000.00 would be excess revenue [TR, p. 128]. According to Mr. Broughman, North Shelby uses excess revenues to upgrade and improve its lines and other facilities, and make extensions to new customers [TR, pp. 127–128]. The parties stipulated that when fully developed, Brassfield, the Meadows, and Partridge Run Estates Subdivisions will be among the most densely populated and most profitable areas North Shelby would serve [TR, p. 127]. At present, North Shelby's water rates are higher than the Commission's, primarily because North Shelby's system has a higher per user cost required to serve its many rural customers [TR, pp. 129–130]. If North Shelby were to provide water service to Brassfield, the Commission would not experience any significant loss of its revenues, primarily because North Shelby would purchase the water it would use for the subdivision from the Commission [TR, p. 515].

The other subdivision in dispute in this action is Partridge Run Estates, located east of the City of Shelbyville, and highlighted in pink on Plaintiff's Exhibit 7–A. The northwest corner of Partridge Run is at the intersection of Benson Road/Highway 1779 and Rocket Lane/Highway 1871. As part of the original construction of its system, and as shown on Plaintiff's Exhibit 5A in yellow ink, North Shelby installed a 6″ water distribution line that was connected to a 10″ Commission line on the west side of Highway 1871, crossed under the road to the east side thereof, ran northerly to the east side of the intersection with Highway 1779 and then proceeded eastward on the south side of Highway 1779. A farm owned by Mrs. Tommie Boyd was located at the southeast side of the intersection of Kentucky 1871 and Kentucky 1779 [TR, pp. 83–232]. Due east of the Boyd farm was that of Mrs. Emma Catlett [TR, pp. 83–84; Plaintiff's Exhibit 5–A]. North Shelby's 6″ distribution line continues eastward serving farms and other property that eventually were developed as subdivisions [TR, pp. 84–87, 233–235]. None of the property which eventually became Partridge Run Estates has been annexed by the City of Shelbyville, nor did the Commission, prior to the development of Partridge Run, serve any customers within the property that became that subdivision [TR, p. 149]. When fully developed, Partridge Run will eventually include both the former Boyd and Catlett property [TR, p. 86].

At the point where the Commission's water line in this area connects with that of North Shelby, the Commission has for many years provided water to various public schools located on the west side of Kentucky 1871 [TR, pp. 455–457; Defendant's Exhibit 20; Plaintiff's Exhibit 7–A]. It also provides water to subdivisions south and southeast of Partridge Run, all of which are also not within the city limits [TR, pp. 459–560; Defendant's Exhibit 20].

About three years ago, Douglas Dean Thurman, a local real estate developer, bought the property that was to become Partridge Run Estates and owned it for about seven months [TR, p. 361]. During the time that he owned the property, Thurman secured a zoning change and preliminary and final plat approval for the proposed subdivision and then sold the property [TR, p. 361]. Thurman secured the zoning change from agricultural to residential, single family [TR, p. 361]. To secure the zoning change, Thurman first had to get utility approvals and then go before the Zoning Board [TR, p. 362]. As to the utility approval, Thurman first went to the Sanitation Sewer District, as its sewer lines were about thirty to one hundred feet from the property [TR, pp. 363–364]. For Phase I of the development, Thurman was given sewer capacity for 50 lots [TR, p. 364]. The total project would have 166 single family lots [*Id.;* Plaintiff's Exhibit 11–D].

As to water service, it was Thurman's impression that North Shelby's water lines running on the west and north sides of his property were too small to provide adequate water capacity for the total development of the property [TR, pp. 364–365]. Mr. Thurman did not consult with North Shelby's engineer or manager to obtain reliable information on North Shelby's water capacity in that area [TR, p. 381], and Thurman's impression was incorrect [TR, pp. 558–559, 561–562, 568, 380–381]. Thereafter, Thurman consulted with the Commission, and learned that it had much larger water lines that ran to the west side of Highway 1871 to the point where it connected with the smaller North Shelby line [TR, p. 365]. Thurman had about a week to ten days to make his decision on water service before he went before the Zoning Board, and advised North Shelby's attorney that Thurman was going to use the Commission's water lines because they were bigger [TR, p. 367]. According to Thurman, North Shelby's attorney did not voice any opposition to Thurman's decision [TR, p. 369]. Thurman secured the signature of Gene Fouts, the Commission's manager, to the preliminary plat to be presented to the Zoning Board, certifying that the

Commission would provide domestic water service to the development and had the necessary water capacity for fire protection [TR, p. 368].

Thereafter, Thurman went to two or three meetings of the Planning and Zoning Commission, and no representative of North Shelby was present at any of those meetings [TR, p. 370]. After final approval of the first phase of the development was granted by the Zoning Board, the Commission, in late March or April of 1989, started installing additional water lines to serve the subdivision [TR, pp. 460–461]. According to Mr. Fouts, the Commission's manager, it made sense for the Commission to provide water service to Partridge Run, in that the Commission was already providing water service at the time to Thoroughbred Acres, a subdivision on the southeast side, as well as a subdivision on the south side and properties west of Highway 1871 [TR, pp. 459–460]. In other words, the Commission was already providing, at that time, water services to property on three of the four sides of the Partridge Run development. According to Mr. Fouts, the Commission's first knowledge that North Shelby wanted to provide water service to Partridge Run was with the filing of this action on May 18, 1989 [TR, p. 460]. The initial development of Partridge Run, Phase I, the only phase for which final approval has been secured from the local Planning and Zoning Board [Plaintiff's Exhibit 11–E], will consist of 51 single family lots [TR, pp. 115–116]. As of the time of trial, twelve houses have been built in Partridge Run [TR, p. 116].

As shown on Plaintiff's Exhibit 11–D, the preliminary plat for full development of Partridge Run, and illustrated in green ink, North Shelby has had, well prior to the proposed development of Partridge Run, a pump station located on the north side of Highway 1779, from which a 6″ water line runs eastward and goes under Highway 1871 to the east side thereof [TR, pp. 116–117]. At that point, another 6″ water line runs south under Highway 1779 and then runs eastward through lot 166 through lot 153 of the development [TR, p. 116]. On

the final plat for Phase I of the development, Plaintiff's Exhibit 11–E, those same lots in the development have been renumbered beginning with lot 48 [TR, p. 117]. The record is silent as to the location of the additional water lines that the Commission installed in 1989 to serve Partridge Run.

An original customer of North Shelby, Garland Shuck, owns a farm immediately adjacent to the northeast corner of Partridge Run [*see* Plaintiff's Exhibit 11–D], and he is served by the 6″ water distribution line of North Shelby that runs through what have been preliminarily platted as lots 166—153 of Partridge Run [TR, pp. 232, 234–235, 86–87].

As to the property owners in the pertinent area who signed up to receive water service from North Shelby as original customers, those individuals were Ms. Tommie Boyd, Emma Catlett and Garland Shuck [TR, p. 232]. While Ms. Boyd did sign up for service, she never had a house on that property and never was an actual customer of North Shelby [TR, p. 246–247]. Ms. Catlett's home did receive original service, and when it later burned, North Shelby provided water to a new house that was built between the Catlett and Shuck property, but was not on any of the land that eventually became Partridge Run [TR, pp. 233–234, 249]. While North Shelby's water line extended through the property that eventually became Partridge Run, it did not serve any customers on any of the land that eventually became that subdivision [TR, p. 249].

In summary, prior to the proposed development of Brassfield/Meadows Subdivisions, North Shelby had an 8″ water main running northward along the west side of Highway 53 and ran a service line underneath Highway 53 to the east to serve the farm house of the farm which eventually became these two subdivisions. As to Partridge Run, North Shelby's water line runs through the property that was later subdivided. However, as to all of the subdivisions in question, North Shelby has not lost any of its earlier customers in these areas by virtue of the later development of the property into subdivisions. By the same token, prior to the development of all of the subdivision property, the Commission did not provide any water service thereto, but the water service it is now providing was connected to water lines the Commission had earlier installed nearby.

It is undisputed that North Shelby has not refused to provide water service to any of the subdivisions. However, one factor apparently affecting the developers' decision to secure Commission water service was the greater water capacity of the Commission's lines, which were deemed necessary for water adequate to serve fire hydrants to be installed in the subdivisions, as required by the regulations of the local Planning and Zoning Commission. There is a dispute in the record as to representations made by North Shelby as to its ability to provide water adequate for fire protection to these subdivisions. Apparently, at the early stages of the subdivisions' development, the developers and certain representatives of North Shelby believed that North Shelby was unable at the time to provide adequate fire protection water. However, North Shelby maintains that with ongoing improvements to its system, as well as additional improvements it is capable of making, it is well able to provide fire protection service to these subdivisions, particularly as they are gradually developed over time.

The parties agree that North Shelby has not actually provided water service to the subdivision properties. However, because its water lines are located either adjacent to or run through the properties, North Shelby contends that it has water service "made available" within the meaning of 7 U.S.C. § 1926(b), entitling North Shelby to the injunctive relief authorized by the statute to prevent the Commission from taking potential customers from North Shelby. On the other hand, the Commission contends that because North Shelby has no actual customers within the properties in question, North Shelby has not "provided service," and therefore is not entitled to the protection of § 1926(b).

In pertinent part, 7 U.S.C. § 1926(b) provides:

The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise or similar service during the term of such loan . . .

The parties agree that North Shelby has not actually "provided" water service to the subdivisions in question. However, North Shelby contends that the subject property is within its "area served" or in which service has been "made available" and which service has been "curtailed or limited" by the Commission in violation of § 1926(b).

█ As evidenced by the legislative history of the statute, Congress intended that § 1926(b) be construed broadly to prevent municipal encroachment on a rural water association's service area by means of annexation or grant of a private franchise. After reviewing the legislative history, all of the federal courts that have interpreted § 1926(b) have concluded that the statute should be liberally interpreted so as to protect rural water associations indebted to the Farmers Home Administration ("FmHA") from municipal encroachment. *Jennings Water, Inc. v. City of North Vernon, Ind.*, 895 F.2d 311, 315 (7th Cir. 1989); *Glenpool Utilities Authority v. Creek County Rural Water District No. 2*, 861 F.2d 1211, 1214 (10th Cir.1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989); *City of Madison, Miss. v. Bear Creek Water Ass'n., Inc.*, 816 F.2d 1057, 1059 (5th Cir.1987); *Pinehurst Enterprises, Inc. v. Town of Southern Pines*, 690 F.Supp. 444, 451 (M.D.N.C.1988), *aff'd* 887 F.2d 1080 (4th Cir.1989); *Moore Bayou Water Ass'n., Inc. v. Town of Jonestown, Miss.*, 628 F.Supp. 1367, 1369 (M.D.Miss. 1986); *Rural District No. 3 v. Owasso Utilities Auth.*, 530 F.Supp. 818, 824 (M.D.Okla.1979). In *Owasso*, the Court enjoined a municipality from selling water to customers located within the rural association's territory as a violation of § 1926(b) when such sales "result in competition with a rural water district." *Id.*

In this case, the determination whether North Shelby has made water service "available" to potential residents of the subject subdivisions within the meaning of § 1926(b) first requires an analysis of applicable Kentucky law regarding how and where North Shelby must provide water service to potential customers.

As a "regulated utility" under Kentucky law, North Shelby is subject to rate and service regulation by the PSC. KRS 278.-040. By issuance of a Certificate of Convenience and Necessity, the PSC determines that a need and demand for water services exist and authorizes construction and operation of a water distribution system in a specific geographic location [TR, pp. 160–161]. According to a staff attorney for the PSC that testified in this action, Rebecca Goodman, as a rural water association, North Shelby did not receive from the PSC, nor does it grant, exclusive rights to service areas [TR, p. 160]. There is no operative definition under Kentucky law of the phrase "service area" to delineate North Shelby's territory [TR, p. 165].

Although the parties devoted a great deal of time and effort to disputing whether or not North Shelby had a "service area" or had reliably established any "boundaries" to delineate its territories, any factual findings in this regard are unnecessary. Rather, it is concluded that the proper focus should be upon the location of North Shelby's actual distribution lines (as Ms. Goodman called it, "the actual pipe in the ground"—TR, p. 165), and determine if, at such locations in relation to the subject subdivision properties, North Shelby has actually made service "available" prior to the time that the Commission started to provide water service to these properties.

As to the Partridge Run Estates property, North Shelby's 6″ distribution line actually runs through a portion of that property [lots 166–153, *see* Plaintiff's Exhibits 11–D and 11–E]. As to Brassfield/Meadows, North Shelby's 8″ distribution line running northward on the west side of Highway 53 is fifteen feet west of the western edge of the highway right-of-way [Plaintiff's Ex-

hibit 4–A]. The Highway 53 right-of-way is sixty feet wide [Plaintiff's Exhibit 11–C]. Brassfield is adjacent to the east side of Highway 53 [Plaintiff's Exhibit 7–A].

North Shelby's "distribution" lines in these areas are lines "from which service connections with customers are taken at frequent intervals." 807 KAR 5:066(3). To receive water service, a customer must be connected by a service line to a distribution line. *Id.*, §§ (4) and (5). As a utility regulated by the PSC, North Shelby is required to make "reasonable" extensions of its water lines to serve any customer who would apply for service from one of its distribution lines [TR, pp. 168–169]. KRS 278.280(3); *City of Bardstown v. Louisville Gas and Electric Co.*, Ky., 383 S.W.2d 918, 920 (1964). The obligation to make a reasonable extension to any requesting customer exists regardless of whether the existing distribution line runs down the same side of the road on which the proposed customer's property is located, or is on the opposite side of the road [TR, pp. 138–140]. When a service line is installed to connect a customer to a distribution line, North Shelby is required to pay for the first fifty feet of the extension. For any extension exceeding fifty feet, the customer would be required to pay the additional cost, although refunds are made for the customer's payment if other customers later connect during a certain period of time [TR, pp. 121–122].

■ Thus, while North Shelby has never actually "provided" water service to any customer within the subject subdivisions, it has, under Kentucky law, made water service "available" to potential customers within the subdivisions by virtue of the proximity of North Shelby's distribution lines to Brassfield/the Meadows, and the location of a distribution line within the Partridge Run Estates property.

From the conclusion that North Shelby has made water service "available" to the areas in question within the meaning of § 1926(b), it is undisputed that the Commission's present and prospective water service provided to the subject subdivisions has "curtailed or limited" that which North Shelby could provide in violation of § 1926(b). The additional net revenue North Shelby would receive if it were to serve the subdivisions, over the remaining term of North Shelby's loans with the FmHA, is significant. The additional net revenue North Shelby would receive would be available to reduce its per user costs, and would make its loans from the FmHA more secure, which are among the purposes for which § 1926(b) was enacted. *Jennings*, 895 F.2d at 315.

The fact that North Shelby's water lines, as to Brassfield/the Meadows, are simply adjacent to, but not within, that property does not defeat North Shelby's entitlement to the protections of § 1926(b) as to that property. Because North Shelby is required under Kentucky law to provide extensions of service to potential customers located reasonably near to its distribution lines, North Shelby is capable of providing water service to the subdivisions within a reasonable time after application for service. *Glenpool*, 861 F.2d at 1213. Contrary to the Commission's argument, the fact that North Shelby does not have water lines nor prior customers actually within the Brassfield/Meadows property is not dispositive.

The Commission also contends that by virtue of the fact that North Shelby has no tangible or intangible property rights in the new subdivisions, there has been no curtailment or limitation of its service. The Commission argues that North Shelby has made no investment in the areas encompassed by these subdivisions, and by providing water service to them, the Commission is not taking any equipment, facilities, current income or customers from North Shelby, citing *Owen County Rural Electric Co-op. Corp. v. Public Service Commission*, Ky.App., 689 S.W.2d 599 (1985). That decision is clearly distinguishable, as it involved competing electric utilities, one of which was allowed to invade the undeveloped, but "certified territory" of another by the PSC. Moreover, that case did not involve the application of federal law, and the Kentucky law applicable to the territory of an electric utility has no impact upon,

and does not alter the analysis above as to service requirements imposed upon North Shelby.

The Commission also argues that North Shelby has not in fact made water service available to the subdivisions in question because it does not have the present capacity to provide an adequate level of water for fire protection. This argument must be rejected on both legal and factual grounds. The adequacy of the water service North Shelby is presently able to provide, including fire protection, is irrelevant to a determination whether North Shelby is entitled to the protections of § 1926(b). *Owasso*, 530 F.Supp. at 823.

Resolution of questions as to the adequacy of water service to be provided is within the exclusive jurisdiction of the appropriate regulatory agencies, which in this case would include the PSC, and the local Planning and Zoning Commission. If North Shelby is incapable of providing the required level of service, the appropriate regulatory agencies are authorized to refuse to permit North Shelby to serve those areas. 7 U.S.C. § 1926(b) was not intended to make federal courts into regulatory agencies for rural water systems. As the legislative history for § 1926 indicates, the purpose of the FmHA loan program is to secure for rural residents "a safe and adequate supply of running household water." S.Rep. No. 566, 87th Cong., 1st Sess., Reprinted in 1961 U.S.Code Cong. & Admin.News 2243, 2309. As the evidence in this case clearly establishes, North Shelby has made such water service "available" to the subdivisions in question. Whether North Shelby can and should provide a greater level of water service is a decision entrusted to the authority of the appropriate state and local regulatory agencies. No agency has determined that North Shelby cannot or will not provide the required level of service. In fact, as to Section 1 of Brassfield, which is the only portion of the Brassfield/Meadows development to have received final plat approval, North Shelby has certified to the satisfaction of the local Planning and Zoning Commission that it is capable of providing adequate water service, including that necessary for fire pro-

tection [Plaintiff's Exhibit 11–B]. As to the remainder of the Brassfield/Meadows development, final plat approval has not yet been obtained but North Shelby has also certified its ability to provide the necessary level of water service for fire protection [Plaintiff's Exhibits 11–A, 11–C; TR, pp. 308–312a]. In the opinion of North Shelby's engineer, which was undisputed by any other witness, North Shelby is capable of providing a level of water service adequate for fire protection [TR, pp. 566–568].

In summary, the undisputed evidence of record establishes North Shelby's entitlement to the protection of 7 U.S.C. § 1926(b). The scope of appropriate injunctive relief to be imposed by this Court is a question not yet fully developed in the record. However, at a minimum, North Shelby is entitled to an injunction enjoining the Commission from providing water service to the subdivisions in question. Whether the scope of such relief should extend only prospectively, as to future water service in these areas, or should also encompass that water service which the Commission is presently providing to the subdivisions, is a question that the Court will direct the parties to address more fully.

In its answer to the complaint, the Commission also raised affirmative defenses of estoppel and waiver, that 7 U.S.C. § 1926(b) violates the Tenth Amendment, and that North Shelby has failed to join an indispensable party, the City of Shelbyville [Record No. 3]. However, in its post-trial memorandum of law, the Commission does not argue any of these affirmative defenses, and no evidence was presented at trial in support of them. Accordingly, these affirmative defenses shall be deemed to have been abandoned.

As part of the injunctive relief it requests, North Shelby in its post-trial reply brief [Record No. 93, p. 31] requests the Court to Order that the Commission turn over to North Shelby all of its existing water lines in the subdivisions in question. Additionally, North Shelby requests the Court to enjoin the Commission not only

from providing water service to the specific subdivisions in question, but also generally as to any locations within North Shelby's alleged "service area" which the Commission might attempt to serve in the future. As to North Shelby's latter request, the Court cannot and will not issue a prospective injunction as to locations other than the particular subdivisions upon which proof was presented at trial, and which were the only areas for which North Shelby in its complaint requested injunctive relief. However, it is anticipated that the Court's rationale for finding a violation of § 1926(b) as to the specific subdivisions in question is sufficiently clear that the Commission will not attempt similar encroachments upon other locations in the future, assuming that North Shelby would, in fact, object thereto. As to the Commission's existing water lines within the subdivisions, all that the Court anticipates that it will order is that the Commission cease and desist from providing water service therein, but only at such future date on which North Shelby can provide appropriate water service and is authorized to do so by any necessary regulatory agency without any unreasonable interruption in the service presently being provided to the customers in those subdivisions. Whether North Shelby wants to acquire the Commission's lines upon such terms and conditions as the parties may agree, or instead run its own lines, is a matter for North Shelby (and/or the PSC) to resolve, not this Court.

For the reasons given above, judgment shall be entered this date in favor of Plaintiff, North Shelby Water Company, awarding it a declaratory judgment that Defendant, Shelbyville Municipal Water and Sewer Commission, has violated the provisions of 7 U.S.C. § 1926(b) by providing water service to the properties in question and awarding North Shelby all injunctive relief necessary and appropriate to remedy the statutory violation. By virtue of such judgment, North Shelby's alternate state law claims are moot and shall therefore be dismissed with prejudice. By separate order, the parties shall be directed to address the question of the scope of and particular provisions of the injunctive order to be entered by the Court subsequently.

This the 25th day of March, 1992.