**RURAL WATER SYSTEM # 1, an Iowa non-profit corporation, Plaintiff,**

v.

**CITY OF SIOUX CENTER, IOWA, Defendant.**

**No. C95–4112–MWB.**

United States District Court, N.D. Iowa, Western Division.

Nov. 12, 1998.

Louis T. Rosenberg, P.C., San Antonio, TX, Randall G. Sease, Sease Law Firm, Harley, IA, for Plaintiff.

Ivan T. Webber of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND JUDGMENT REGARDING TRIAL ON THE MERITS

BENNETT, District Judge.

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................... 979
 A. The Summary Judgment Ruling ........................................ 980
 B. Findings Of Fact ................................................ 981
 1. Stipulated facts ............................................. 981
 2. Further findings of fact ......................................... 982
 a. The RWS # 1 system ......................................... 982
 b. Existing customers inside the 1989 city limits .................... 984
 c. New customers inside the 1989 city limits ....................... 985
 d. Customers outside the 1989 city limits ........................ 986

II. **LEGAL ANALYSIS** ........................................................986
 A. *Reconsideration Of The Summary Judgment Ruling* .....................987
 1. *Payne and the Bell Arthur briefs* ...............................987
 2. *The import of Payne and legislative history* ......................988
 B. *The Scope Of RWS # 1's § 1926(b) Protection* .......................988
 1. *The import of the court's summary judgment ruling* ...............988
 2. *The Vande Berg Scales trade* ....................................989
 3. *Service and encroachment outside the 1989 boundary* .............991
 a. *Matters of geography and timing* .............................991
 b. *Adequacy of service* .........................................992
 i. *Fire protection* ..........................................992
 ii. *Capacity, pressure, and storage* ..........................994
 C. *State Law Claims* ..................................................995
 1. *Tortious interference* ...........................................995
 2. *Conversion* ......................................................996
 3. *Inverse condemnation* ............................................999
 D. *Remedies* .........................................................1000

III. **CONCLUSION** ...........................................................1002

Trial on the merits is the second major battle in this "turf war" between a non-profit corporation and a municipality over which entity is entitled to distribute water in a disputed territory surrounding the municipality. In the first major battle, on the parties' cross-motions for summary judgment, the court clarified—or thought it clarified—precisely what territory is still in dispute and what issues remained to be tried. *See Rural Water Sys. # 1 v. City of Sioux Center, Iowa,* 967 F.Supp. 1483 (N.D.Iowa 1997). After pre-trial briefing, a bench trial that lasted several days and involved the presentation of voluminous exhibits—such as maps detailing the location, size, flows, and pressures of pipelines and the location of disputed customers—post-trial briefing, and closing arguments, the court can safely say that, although perhaps no wiser, it is considerably better informed. The court must now try to end this turf war by apportioning territory and ordering reparations, if appropriate.

## I. INTRODUCTION

Plaintiff Rural Water System # 1 (RWS # 1), a non-profit corporation, filed the original complaint in this lawsuit on November 2, 1995, and an amended complaint on October 22, 1996, against defendant City of Sioux Center, Iowa (the City), alleging generally violations of 7 U.S.C. § 1926(b), which protects rural water associations indebted to the United States from encroachment on their service areas by adjacent municipalities. In addition, RWS # 1 asserts three state-law claims: tortious interference with prospective business advantage, conversion of property, and inverse condemnation. All of RWS # 1's claims allegedly arise from the City's annexation of portions of RWS # 1's asserted service area, the City's demands that it, not RWS # 1, supply the water needs of customers in the annexed areas and within two miles of the City's new boundaries, and the City's actual service to some of the customers in the disputed area, which RWS # 1 alleges resulted in "curtailment" or "limitation" of RWS # 1's federally-protected service area. As relief, RWS # 1 requests preliminary and permanent injunctions prohibiting the City's curtailment of RWS # 1's service area in violation of 7 U.S.C. § 1926(b); declaratory judgment concerning the rights of the parties to serve the disputed area and alleged violations of state and federal law; equitable relief; damages, both compensatory and punitive; and attorney's fees and costs. The issues for trial were clarified by the court's ruling on cross-motions for summary judgment on May 27, 1997.

This matter proceeded to trial beginning on May 11, 1998, and concluding on May 14, 1998. Closing arguments, however, were not held until October 29, 1998. At closing arguments, as at trial, plaintiff RWS # 1 was represented by lead counsel Louis T. Rosenberg of Louis T. Rosenberg, P.C., in San Antonio, Texas, who argued the case on behalf of RWS # 1, and local counsel Randall G. Sease of the Sease Law Firm in Hartley,

Iowa. Defendant City of Sioux Center, Iowa, was represented by counsel Ivan T. Webber of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., in Des Moines, Iowa.

## A. The Summary Judgment Ruling

Because the court's ruling on the parties' cross-motions for summary judgment, *Rural Water Sys. # 1 v. City of Sioux Center, Iowa,* 967 F.Supp. 1483 (N.D.Iowa 1997), framed the factual and legal issues for trial, the court will recapitulate the conclusions in that ruling here. In the summary judgment ruling, the court considered, *inter alia,* the requirement that the entity seeking protection under § 1926(b) be indebted to the United States at the time of the alleged curtailment of its protected service area.[1] After examining the record concerning RWS # 1's "buy out" of its notes to the United States,[2] and interpretation of the pertinent statutory provisions governing that "buy out," [3] the court concluded that RWS # 1 lost the protections of § 1926(b) when it bought back its notes in 1988 and did not regain such protections until RWS # 1 again became indebted to the United States in 1992. Consequently, the court concluded that RWS # 1 could not state a claim that the City violated § 1926(b) when it annexed portions of the disputed territory in 1989, because RWS # 1 simply had no protection of § 1926(b) to assert against that annexation. The court therefore granted summary judgment in favor of the City on any part of any claim in which RWS # 1 asserted that the City's expansion to its 1989 city limits involved a curtailment or limitation of RWS # 1's service area in violation of § 1926(b), and denied that part of RWS # 1's cross-motion for summary judgment asserting that the City's expansion to its 1989 city limits violated § 1926(b).

The question of whether curtailments or threatened curtailments of RWS # 1's service area occurred in violation of § 1926(b) after July 1, 1992, when RWS # 1 again became indebted to the United States, the court concluded, would have to await resolution upon trial on the merits. The court concluded that RWS # 1's service area, where it "made service available," must be determined by the coincidence of RWS # 1's legal right or authority to serve, a matter of state law, and its physical ability to serve, a matter of fact determined by the "pipe-in-the-ground test" established by federal precedent. The court found that the Iowa statute the City contended established RWS # 1 had no legal right to serve within two miles of the City's 1989 city limits, IOWA CODE § 357A.2, is not applicable to an entity such as RWS # 1, which is not a "special water district," but has instead remained a water service association.

Therefore, the court concluded, the question of the extent of RWS # 1's protected service area turns on RWS # 1's physical ability to serve portions of its service area. Where RWS # 1 was physically able to serve, however, was the subject of genuine issues of material fact. In particular, the court found that the City had generated genuine issues of material fact as to whether RWS # 1 had an agreement with the City that one of its lines would be only a dedicated transmission line, thus excluding that line from defining where RWS # 1 physically made service available. Other fact questions persisted as to RWS # 1's physical ability to serve the entirety of the area outside of the City's 1989 boundaries that RWS # 1 claims is protected by § 1926(b).

---

1. The statutory provision upon which RWS # 1's federal claim is based provides as follows:

 **(b) Curtailment or limitation of service prohibited**
 The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area *during the term of such loan;* nor shall the happening of any such event be the basis of requiring such association to secure any fran-

 chise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.
 7 U.S.C. § 1926(b) (emphasis added).

2. RWS # 1's pay-off of its federal loans in 1988 was pursuant to the Omnibus Budget Reconciliation Act (OBRA) of 1986 and the Agricultural Credit Act of 1987(ACA), which amended the 1986 OBRA by providing for a "Buy Out Program" of FmHA loans.

3. The pertinent provisions are subsections (f) and (g) of 7 U.S.C. § 1929a *note.*

Consequently, the court denied the cross-motions for summary judgment to the extent not otherwise resolved, and stated that this matter would proceed to trial on the question of the extent of RWS # 1's physical ability to serve all portions of its asserted service area *outside* of the City's 1989 city limits and the City's encroachment upon any protected service area. The findings of fact, which follow, are molded to address the remaining questions identified in the summary judgment ruling.

## B. Findings Of Fact

These findings of fact are not meant to be exhaustive. They are intended instead to provide the necessary context for the legal analysis that follows. Further findings of fact, where necessary, appear in that legal analysis. These findings of fact begin with the parties' stipulation of facts in the final pretrial order.

### 1. Stipulated facts

RWS # 1, a non-profit corporation created pursuant to IOWA CODE CH. 504A on May 6, 1969, operates as a retail water service corporation. RWS # 1 began providing or making services available in 1972 to a general area approximately eighteen miles by thirty-six miles, and including thirteen townships, in Sioux County, Iowa, and six townships in O'Brien County, Iowa. RWS # 1 completed installation of its pipes in its first rural area (Phase III area) in 1975 and 1976. Although RWS # 1's building projects were financed by the Farm Home Administration (FmHA), RWS # 1 was not indebted to FmHA from September 22, 1988—after participating in a buy out authorized by the Omnibus Budget Reconciliation Act (OBRA) of 1986 and the Agricultural Credit Act of 1987(ACA)—until July 1, 1992. However, on July 1, 1992, and again in 1995, RWS # 1 became reindebted to the FmHA for a total of $2,030,000. In 1992, the City was aware that RWS # 1 was requesting a $1.7 million loan from the FmHA to fund improvements to RWS # 1's Water Treatment Plant No. 2, which is just outside and to the west of Sioux Center. The parties do not dispute that RWS # 1 is "an association" within the meaning of § 1926(b), and that as of July 1, 1992, RWS # 1 had a qualifying outstanding obligation to the FmHA.

The City of Sioux Center is a municipal corporation organized under Iowa law and located in Sioux County, Iowa. It also operates a water supply system, as a municipal utility, and supplies customers inside its city limits. The City has from time to time contracted with RWS # 1 for water treatment and the parties have been involved in other joint uses of facilities. Specifically, the City has paid RWS # 1 to treat City well water to bring it to a certain grade or quality pursuant to a 5–year agreement entered into in 1992.

On December 22, 1989, the City annexed 1,620 acres outside of its 1975 city limits. These 1,620 acres of land included territory in which RWS # 1 had previously supplied water or had laid pipes and built other facilities. RWS # 1 had certain installations and facilities in place between the City's pre-existing 1975 boundary and its 1989 boundary, some of which existed around the peripheral areas of what became the 1989 boundary. RWS # 1 continues to supply water to some customers now inside the City's 1989 city limits. On October 1, 1990, the City also voluntarily annexed 2.88 acres of land adjacent to its 1989 boundaries. In December of 1995, the City annexed another twenty acres, known as "the Byl Subdivision," by voluntary annexation. Next, in March of 1996, the City annexed an additional 0.41 acres north of its 1990 annexation by voluntary annexation. Between the City's 1989 boundary and its present boundary, RWS # 1 has an investment and facilities in place.

RWS # 1 has at times advised the City of requests for connection to the rural water system from customers within two miles of the City's 1989 city limits and has asked the City to advise RWS # 1 whether the City or RWS # 1 should supply the customer. In June of 1994, the City installed a water line mainly along Harrison Avenue/13th Avenue Southeast, which street is the eastern city limit of Sioux Center. The installation of this water line was performed by contractor Jim Mouw, doing business as Jim's Digging Service. In 1996, Mr. Mark Donnell, a resident of the Byl Subdivision, paid Mr. Mouw to install a water line that crossed RWS # 1's line, crossed over to the west side of Harri-

son Avenue, and connected with the City's newly-constructed 8–inch waterline, which runs parallel to RWS # 1's line, installed in 1975, and already in place in Mr. Donnell's front lot.

## 2. Further findings of fact
### a. The RWS # 1 system

In addition to the above facts, to which the parties have stipulated, the court finds the following facts have been proved from the evidence presented at trial. The following map, a miniaturization of Plaintiff's Trial Exhibit 114A, may be of assistance to understanding various matters discussed in this ruling. The actual trial exhibit, however, included handwritten identifications of various customers and other notations made by witnesses in the course of trial. On this map, RWS # 1's customers are shown as squares and the City's customers are shown as circles; the City's 1975 and 1989 boundaries are shown as dashed lines; and RWS # 1's water lines (in colors in the trial exhibit) are shown as solid lines with indications of their diameters in inches.

EXHIBIT NO. 1
CURRENT FACILITIES

All of RWS # 1's easements for pipeline were acquired by agreements with landowners or municipalities: RWS # 1 does not have the power to condemn rights-of-way or easements for its pipelines. Thus, nearly all of RWS # 1's pipeline, when laid, ran through private rural land, roughly parallel to, but just outside, the 1975 city limits of Sioux Center, or roughly paralleled the 1975 city limits at a distance. In 1975, RWS # 1's pipeline formed a rectangle around Sioux Center, and was contiguous to the city limits only for a short portion of Harrison Avenue/13th Avenue N.E. on the east, and a very short portion of Grant Avenue/13th Avenue N.W. on the west. However, since the City's annexation of 1,620 acres in 1989, RWS # 1's pipeline runs along, partly inside and partly

outside, the eastern city limit, the northern city limit, and a slightly longer portion of the western city limit than was the case in 1975.[4] On the south, RWS # 1 has an 8–inch transmission line from its Treatment Plant No. 2 to the west of the City to its reservoir to the east of the City, built in 1988, that runs east-west for most of its course, partly through the annexed area where it formerly paralleled the 1975 city limit, and partly parallel to, but outside, of the new 1989 boundary in an area along 410th Street/20th Street S.E. east of U.S. Highway 75. The City has never condemned, disturbed, or interfered with the function of any portion of RWS # 1's pipeline that eventually came within City limits, although RWS # 1 contends that the utility of some of its lines has been impaired because they can no longer serve additional customers.

The undisputed testimony at trial, from witnesses for both RWS # 1 and the City, was that the 8–inch water line RWS # 1 installed in 1988 adjacent to the City's 1975 southern boundary was intended to be and in fact is used solely or strictly for transmission of water from RWS # 1's treatment plant to the west of the City to its reservoir to the east, not as a service line. RWS # 1 contends that this line could, however, be used to enhance pressure and flow for fire protection, and that it could be tapped for fire hydrants, a matter the court need not resolve. However, in the same trench with the 8–inch dedicated transmission line, RWS # 1 also laid a 2–inch service line for a short distance crossing and then running east and west of U.S. Highway 75, a fact not presented in the summary judgment record. This service line was connected to a pre-existing 3–inch service line, laid in about 1975 or 1976, not to the 8–inch dedicated transmission line laid in 1988. The City protested the installation of this 2–inch service line, at the time it occurred, as contrary to an agreement between the parties that only a transmission line would be laid in 1988 along 410th Street. As a practical matter, this 2–inch service line does not now and never has serviced any customers. Jean Still, the manager of RWS # 1 testified that the 2–inch service line was laid at the same time as the 8–inch dedicated

transmission line, because of the expense and difficulties of obtaining permits and making installations when a water line crosses a highway, such as U.S. Highway 75. The 2–inch service line has never serviced customers, because adjacent territory RWS # 1 anticipated servicing from it was annexed by the City in 1989, a year after the line was built.

The RWS # 1 pipeline system is designed to provide only potable running water for rural customers, including residences, business, and farmsteads. It is not designed specifically for, and has never been required by state or federal regulations or permit-issuing or funding agencies to provide, fire flow protection. Experts for both parties agreed, and the court finds, that RWS # 1 was not required to provide fire flow protection by any existing regulations of any governing entity. Indeed, Jean Still testified that she had not heard much about fire flow until this litigation, although she testified that, if required, she believed the RWS # 1 system could provide adequate fire flow either now or within a reasonable time with some modifications. There is no evidence that at any time RWS # 1 has failed to provide potable running water to any customer or service area nor is there any evidence that any customer or regulating body has ever complained that RWS # 1 did not provide such water at an adequate pressure.

The court therefore turns to the circumstances under which certain customers were transferred between RWS # 1 and the City or were connected to City water instead of the RWS # 1 system. This review begins with customers inside the City's 1989 city limits, then turns to customers outside of the City's 1989 limits.

### b. Existing customers inside the 1989 city limits

Relatively few customers brought within the city limits by the 1989 annexation actually changed from RWS # 1 water service to City water. RWS # 1 has retained fourteen pre-existing customers who now lie within the City's 1989 city limits. The City has not

---

4. The majority of the City's 1989 annexation was to the east, north, and south, with only a small area just south of 390th Street/7th Street N.W. added to the "panhandle" on the west.

solicited nor asserted a right to serve any of these customers. However, in 1991, during the period when RWS # 1 was not indebted to the United States, RWS # 1 "sold" five customers to the City as the result of arm's-length negotiations. Those five customers included Marlin Altena, Cornie DeVos, and Norman Sneider, all located just within the southwest corner of the "panhandle" on the west side of the City, outside of the 1975 city limit, but within the 1989 city limit. The remaining two customers in this group of five were Dr. Daryl J. Funk and Dr. C.M. Bleeker, both located on the east side of the City, south of 390th Street and west of Harrison Avenue, in an area around which the 1975 city limit made a "jog," but within the 1989 city limit. These five customers were disconnected from RWS # 1 service in May and June of 1991, and the City made payment of $2,815.35 to RWS # 1 for these customers on July 8, 1991.

Another customer within the City's 1989 boundaries but serviced by RWS # 1 was the subject of a "trade" between the City and RWS # 1. That customer is Vande Berg Scales, which had been a customer of RWS # 1 since 1977. The Vande Berg Scales property was in a small square of territory in the "panhandle" on the west side of the City to the north of 390th Street that was not within the City's 1975 city limits, but which was annexed in 1989.[5] After annexation, RWS # 1 continued to serve Vande Berg Scales until 1994, when the proprietor expressed an interest in changing to City water, because City water was cheaper. By this time, RWS # 1 was re-indebted to the FmHA. The other customer involved in the "trade," Tom Sandbulte, was building a home to the east of the City's 1989 city limits just north of 400th Street/9th Street S.E. and east of Harrison Avenue, i.e., outside of the city limits. At this time, the City was still asserting—erroneously, this court held on summary judgment—that it had an exclusive right to serve customers within two miles of its city limits. Several properties in the area where Mr. Sandbulte was building his home were already serviced by RWS # 1, but the City asserted a right to serve Mr. Sandbulte's new home. RWS # 1—acting under the same misapprehension as the City—had made a practice of acknowledging the City's claim to a two-mile exclusivity zone at least to the extent of asking the City which entity should serve water customers in that zone, and did so in Mr. Sandbulte's case. The parties worked out a deal whereby RWS # 1 traded an apparently dissatisfied existing customer within the city limits, Vande Berg Scales, to the City for the "right" to serve a new customer outside of the city limits, Mr. Sandbulte. RWS # 1 did not obtain FmHA approval for such a trade.[6] Thus, since 1994, Vande Berg Scales has obtained its water service from the City, and Tom Sandbulte has obtained his water service from RWS # 1.

### c. New customers inside the 1989 city limits

"New" customers within the 1989 city limits who were connected to City water instead of RWS # 1 service were the following, beginning in the north and moving clockwise around the City: "Vande Berg Chicken," south of 380th Street/20th Street N.E.; Mr. Van Clyde and Mr. Horstman, just west of Harrison Avenue near Dr. Funk and Dr. Bleeker; Chuck Gue and an unidentified customer just north of 410th Street/20th Street S.E. near the southeast corner of the City's 1989 boundaries; Mr. Vermeer, Mr. Wichers, and Mr. Raak, just south of 410th Street/20th Street S.E. and east of U.S. Highway 75; and Mr. Byker, south of the Vermeer–Wichers–Raak group and near RWS # 1's 3-inch service line running south from the city parallel to U.S. Highway 75.

Although Mr. Vande Berg obtained water for his residence from RWS # 1, he obtained water from the City for his chicken houses after the 1989 annexation. The record is silent as to whether Mr. Vande Berg had previously obtained water for his chicken houses from RWS # 1. Thus, RWS # 1 has failed to prove that it "lost" an existing cus-

---

5. The parties agree that the location of Vande Berg Scales is incorrectly shown on Exhibit 114A as outside of the square of territory referred to above, when it is in fact inside that square.

6. The court will consider in its legal analysis whether such approval was required and the significance of failing to obtain such approval if it was required.

tomer as the result of annexation and service to "Vande Berg Chicken" by the City.

The record, including the testimony of Jean Still, shows that Mr. Van Clyde and Mr. Horstman "came on" to City water service after RWS #1 "sold" the right to serve the nearby properties of Drs. Bleeker and Funk to the City. Again, the record is silent as to whether Mr. Van Clyde and Mr. Horstman had previously obtained water from RWS #1. Thus, RWS #1 has failed to prove that it "lost" existing customers and the court finds instead that these were "new" customers within the City's 1989 limits.

Jean Still testified that Mr. Gue and the unidentified customer "could have been" RWS #1's customers, apparently because they were located near RWS #1's 3–inch service line, "if [the City] hadn't annexed out there." These customers, however, were also within the City's 1989 city limits at the time they sought service. The same applies to Mr. Vermeer, Mr. Wichers, Mr. Raak, and Mr. Byker, all of whom, it appears from the record presented at trial, only sought water service after the 1989 annexation, and then obtained service from the City. Thus, RWS #1 has failed to prove that it "lost" existing customers and the court finds instead that these were also "new" customers within the City's 1989 limits.

### d. Customers outside the 1989 city limits

Turning to customers outside of the City's 1989 limits, although the City's waste water treatment plant was built after 1989 outside of its city limits, RWS #1 does not assert that it ever intended or expected to service that plant as a customer. The City has always provided potable water to the waste water treatment plant. The court concludes that service of potable water to the City's waste water treatment plant is not in dispute.

The 2.88 acres the parties agree was annexed on October 1, 1990, is the property known throughout this litigation as the "Carriage House" property, on which stands a group of apartments. The "Carriage House" property lies just to the east of Harrison Avenue and to the south of 390th Street. It was sold for development by Mrs. Sneller, and is the southernmost of the three "Sneller" properties at issue in this litigation. The City has always provided water service to the Carriage House. At the time of annexation and the commencement of City water service to the Carriage House, RWS #1 was not indebted to the United States. The middle of the "Sneller" properties still belongs to Mrs. Sneller, although she built a new house on the property in 1994 and the parties dispute who had the right to serve that new residence. Mrs. Sneller's original residence was never served by RWS #1—it was in fact serviced by the City—and her new residence is also served by the City. Unlike the Carriage House property, the City commenced water service to Mrs. Sneller's new home at a time when RWS #1 was again indebted to the United States. This "Sneller" property is the 0.41 acres north of the City's 1990 annexation that the parties agree was annexed in March of 1996, at a time when RWS #1 was indebted to the United States. The northernmost of the "Sneller" properties is a property sold to Mr. Vander Vegt. The Vander Vegt property is 2.22 total acres annexed by the City on October 6, 1997. Mr. Vander Vegt began receiving water service from the City after annexation at a time when RWS #1 was indebted to the United States. The parties do not dispute that RWS #1 has service lines available to serve all three of these "Sneller" properties, although the City is currently serving all three.

The remaining customers in dispute outside of the City's 1989 city limits are the residents of the Byl Subdivision, which, as noted above in the recitation of the parties' stipulation of facts, was annexed by the City in December of 1995. The City installed an 8–inch water line to the Byl Subdivision and began providing service there in 1996 even though RWS #1 has a 5–inch service line that crosses the front of each of the four lots in the subdivision. The court finds that the Byl Subdivision was annexed, and the City began providing water service there, at a time when RWS #1 was indebted to the United States.

## II. LEGAL ANALYSIS

### (including some further findings of fact)

The court's legal analysis must be made in several phases, sometimes coupled with outcome determinative findings of fact. In the

first phase, the court must consider RWS # 1's implied invitation to reconsider its summary judgment ruling. Contrary to the summary judgment ruling, RWS # 1 appears to urge the court to find that RWS # 1 is entitled to the protection of § 1926(b) from loss of customers resulting from the City's 1989 annexation, and hence can claim as protected territory the area between the City's 1975 and 1989 city limits. Next, the court must consider whether various customers fall within RWS # 1's federally-protected service area, in light of both RWS # 1's legal right and physical ability to serve those customers. The court must then consider RWS # 1's state-law claims of tortious interference with prospective business advantage, conversion of property, and inverse condemnation. Finally, if RWS # 1 prevails on any of its claims, the court must consider the appropriate remedies.

## A. Reconsideration Of The Summary Judgment Ruling

■ As mentioned above, RWS # 1 appears to invite the court, at least implicitly, to reconsider its summary judgment ruling and find that RWS # 1 is entitled to the protection of § 1926(b) from loss of customers resulting from the City's 1989 annexation. This invitation comes from RWS # 1's post-trial brief, calling the court's attention to the decision of the Fourth Circuit Court of Appeals in *Payne v. Federal Land Bank of Columbia,* 916 F.2d 179 (4th Cir.1990), and the briefs on appeal to the Fourth Circuit Court of Appeals of the decision of the district court in *Bell Arthur Water Corp. v. Greenville Utilities Comm'n,* 972 F.Supp. 951 (E.D.N.C.1997). RWS # 1 asserts that *Payne* and arguments premised upon it demonstrate that RWS # 1 was entitled to the continued protection of § 1926(b) even after it bought out its notes to the FmHA in 1988 until it became re-indebted to the United States in 1992, the period the court has determined was a hiatus in RWS # 1's § 1926(b) protection. The invitation for reconsideration comes as well, and less directly, from RWS # 1's continued reference to the area between the City's 1975 city limits and its 1989 city limits as the "disputed territory," when this court's summary judgment ruling specifically identified the remaining disputed territory as that *outside* of the

City's 1989 city limits. At trial, RWS # 1 presented copious evidence, much of which would otherwise be irrelevant, at least to RWS # 1's federal claim, concerning customers and service lines between the City's 1975 and 1989 city limits, including anticipated new customers in that area, apparently in support of RWS # 1's contention that it was entitled pursuant to § 1926(b) to serve all customers between the old and new city limits, as well as those outside of the 1989 city limits. The court will indulge RWS # 1's desire for reconsideration only briefly.

### 1. Payne and the Bell Arthur briefs

RWS # 1 argues that the *Payne* decision teaches that the focus of statutory construction is the conference committee report and that the decision also explains a federally created right of first refusal under the Agricultural Credit Act of 1989 (the 1989 ACA). However, the court finds that the *Payne* decision is at best only marginally relevant. The provision of the 1989 ACA in question in *Payne* was 12 U.S.C. § 2219a, which provides that where agricultural real estate is acquired by a federal institution as a result of a loan foreclosure, the land is subject to a right of first refusal of the previous owner to repurchase or lease the property. *See Payne,* 916 F.2d at 180 & n. 1. Thus, the provision in question has nothing whatever to do, in the first instance, with what RWS # 1 describes as a "right of first refusal" of an indebted rural water association to buy out its bonds with the United States pursuant to the 1987 ACA and 1986 OBRA "Buy Out Program" of FmHA loans or the interpretation of the statutory provisions pertinent to the buy out program at issue in this case, subsections (f) and (g) of 7 U.S.C. § 1929a note. Nor is the language of the statute at issue in *Payne* comparable in some way to the language of the provisions of subsections (f) and (g) of 7 U.S.C. § 1929a *note,* such that comparison of the language of the two statutes suggests an interpretation of the statute at issue here that is different from this court's interpretation offered upon cross-motions for summary judgment.

Furthermore, the *Payne* decision does not establish that the "focus" of statutory inter-

pretation is the conference committee report, as RWS # 1 suggests. Rather, the court in *Payne*, as did the court in this case, noted that "the origin of any statutory construction is the statute itself." *Payne*, 916 F.2d at 181; *and compare Rural Water Sys. # 1*, 967 F.Supp. at 1516–17 ("When the language of the statute is plain, the inquiry also ends with the language of the statute," quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). As did this court in construing subsections (f) and (g) of 7 U.S.C. § 1929a *note*, the Fourth Circuit Court of Appeals in *Payne* found that the language of the pertinent subsections of 12 U.S.C. § 2219a were "clear and need[ ] no construction." *Id.; and compare Rural Water Sys. # 1*, 967 F.Supp. at 1517–20.

Furthermore, like this court, the Fourth Circuit Court of Appeals found that if plain meaning of the statutory language "were not enough, ... the legislative history bolsters [the court's] conclusion." *Id.* at 182; *and compare Rural Water Sys. # 1*, 967 F.Supp. at 1521–22. In this regard, the Fourth Circuit Court of Appeals did observe that "[t]he part of legislative history which is given the most weight is the conference report." *Id.* Hanging its hat on this observation, RWS # 1 points, in the *Bell Arthur* briefs, to a portion of the Joint Explanatory Statement of the Committee of Conference concerning subsections (f) and (g) of 7 U.S.C. § 1929a *note*—a portion to which RWS # 1 failed to draw this court's attention at the summary judgment phase of these proceedings—in which the committee observed that "[t]he Senate amendment will provide that Section 306(b) of the Consolidated Farm and Rural Development Act must be applicable to all notes or other obligations sold or intended to be sold under Section 1001. (Sec.1001(a).)." Joint Explanatory Statement of the Committee of Conference, 3097–8. RWS # 1 also points to the House Conference Report No. 100–190, which states that "[t]he Conferees intend that issuers of notes and obligations being sold under the requirement of the Budget Reconciliation Act of 1986 be given an opportunity to purchase any unsold obligations and notes for 30 days prior to the announcement of any public offerings." House Conf. Report No. 100–190.

### 2. The import of Payne and legislative history

However, this court has already considered the import of virtually identical pronouncements from the legislative history, those of Senator Boren, the sponsor of the amendment that became subsection (g), and has concluded that nothing in them is clearly supportive of RWS # 1's interpretation of subsection (g) or plainly contrary to the court's. *See Rural Water Sys. # 1*, 967 F.Supp. at 1522–23. RWS # 1's new authority and new arguments simply do not require a different result. Rather, as the court concluded on cross-motions for summary judgment, relying on the plain meaning of the statutory provisions in question and the legislative history, subsection (g) of 7 U.S.C. § 1929a *note* does not extend § 1926(b) protection to an issuer who has bought out its notes from the United States pursuant to the 1986 OBRA and 1987 ACA, thereby extinguishing its notes, and who consequently is no longer indebted to the United States. *See id.* at 1523 & 1534–35.

### B. The Scope Of RWS # 1's § 1926(b) Protection

The second phase of the court's legal analysis requires the court to consider whether various customers fell within RWS # 1's federally-protected service area, in light of both RWS # 1's legal right and physical ability to serve those customers. This phase of the court's analysis begins with the import of the court's summary judgment ruling, as reaffirmed above.

### 1. The import of the court's summary judgment ruling

Because the court finds no reason to retreat from its statutory interpretation and consequent conclusions on summary judgment, the court must reiterate the impact of its conclusions upon the decisions remaining to be made at trial. RWS # 1 lost the protections of § 1926(b) when it bought back its notes in 1988 and did not regain such protections until RWS # 1 again became indebted to the United States on July 1, 1992. Consequently, RWS # 1 cannot state a claim that the City violated § 1926(b) when it annexed portions of the supposedly disputed

territory in 1989, and made further annexations prior to July 1, 1992, because RWS # 1 simply had no protection of § 1926(b) to assert against that annexation.

*In other words, by serving any new customers within the City's boundaries as of July 1, 1992, the City did not—and will not—violate § 1926(b). Nor did purchases of customers within the City's boundaries as of July 1, 1992, while RWS # 1 was not indebted to the FmHA, in any way violate § 1926(b). RWS # 1 simply cannot assert that any part of its federally-protected service area after July 1, 1992, includes any area within the City's boundaries as of that date except for customers within that area that RWS # 1 was already serving on that date.*

More specifically, the court finds that RWS # 1 has failed to prove that after July 1, 1992, it lost any customers it was already serving within the City's boundaries on July 1, 1992, *with the exception of Vande Berg Scales,* which will be discussed separately below. The record shows that RWS # 1 has retained fourteen such customers. The City has not solicited nor asserted a right to serve any of these fourteen customers and therefore has not attempted to encroach upon or "curtail" RWS # 1's existing service area as to these customers in violation of § 1926(b). The court finds that the City's notice to customers of their annexation by the City with the addresses or phone numbers to contact if City services are desired does not constitute "solicitation" of RWS # 1's customers or threatened "curtailment" of RWS # 1's service area. In point of fact, no "curtailment" occurred, because no existing customers, apart from Vande Berg Scales, changed to City water service.

RWS # 1 has no claim for loss of five existing customers within the City's 1989 city limits—Marlin Altena, Cornie DeVos, Norman Sneider, Dr. Daryl J. Funk, and Dr. C.M. Bleeker—that it "sold" to the City in 1991 during the hiatus in its § 1926(b) protection. The court concludes that this sale was an arm's-length transaction between parties who, at that time, were not subject to any legal impediment that would have prevented such a sale.

Nor does RWS # 1 have any claim for loss of "new" customers within the City's 1989 limits—"Vande Berg Chicken," Mr. Van Clyde, Mr. Horstman, Chuck Gue, an unidentified customer just north of 410th Street/20th Street S.E. near the southeast corner of the City's 1989 boundaries, Mr. Vermeer, Mr. Wichers, Mr. Raak, and Mr. Byker. At the time these customers were added by the City, the City, not RWS # 1, had the legal right to serve them, because they were within the City's limits. Therefore, as to these customers, RWS # 1 cannot satisfy the first requirement for § 1926(b) protection, a legal right to serve. *See Rural Water Sys. # 1,* 967 F.Supp. at 1524 & 1527 & 1535.

Nor did RWS # 1's new indebtedness on July 1, 1992, somehow revivify its federal protection for service area within the City's limits as of July 1, 1992, protection RWS # 1 had lost owing to annexations, sales, or trades while it was *not* indebted to the United States. This is so, again, because as to such customers and service area, RWS # 1 cannot satisfy the first requirement for § 1926(b) protection, a legal right to serve. *See Rural Water Sys. # 1,* 967 F.Supp. at 1524 & 1527 & 1535. Rather, the legal right to serve such customers lay (and lies) with the City. Proximity of pipelines or "pipe in the ground" cannot "trump" loss of a legal right to serve. *See id.* at 1526. Therefore, RWS # 1 has no claim for any prospective customers within the City's limits as those limits existed on July 1, 1992. Consequently, much of RWS # 1's evidence of supposed acts of curtailment by the City *within the City's boundaries of July 1, 1992,* is irrelevant, because there was no service area of RWS # 1 within those boundaries to be curtailed beyond RWS # 1's existing customers, all but one of which, Vande Berg Scales, RWS # 1 has retained.

### 2. The Vande Berg Scales trade

The "trade" of Vande Berg Scales for Tom Sandbulte, although an arm's-length transaction between the parties like the "sale" of other customers discussed above, occurred in a significantly different factual and legal context. This "trade" occurred in 1994, when RWS # 1 was again indebted to

the United States, and thus constitutes loss of an existing customer, Vande Berg Scales, who *was* part of RWS # 1's federally-protected service area. The bargain was a bad one, because the City actually had no right to serve Tom Sandbulte, whose new residence was outside the City's limits, while RWS # 1 got nothing more than it was already entitled to and gave away something it was entitled to keep. However, the value of the bargain is not what determines its legality or illegality under § 1926(b). The question is whether RWS # 1 could bargain away an existing customer while it was indebted to the United States.

The City contends that RWS # 1 is estopped by its bargain to complain of the transfer of Vande Berg Scales to City water service. The City contends further that such a trade was permissible under § 1926(b), because a "customer" is not a "facility" that an indebted association is prohibited from transferring or encumbering without written consent of the United States pursuant to 7 C.F.R. § 1942.17(n)(2)(xii).[7] RWS # 1 contends that such estoppel would be contrary to public policy, and thus stands as no bar to its assertion of illegal curtailment resulting from the trade, citing *Jennings Water, Inc. v. City of North Vernon*, 895 F.2d 311, 314 (7th Cir.1989).

The *Jennings Water* decision is the only one the court and parties have identified that addresses directly the impact of estoppel on § 1926(b) protection in a pertinent way. In *Jennings Water*, CSL, a private, not-for-profit utility that had obtained water from Jennings Water, Inc., asserted that Jennings Water was estopped to assert § 1926(b) protection from loss of CSL as a customer, because Jennings Water had not objected when CSL announced that it would purchase water elsewhere. *Jennings Water, Inc.*, 895 F.2d at 313 & 316. The Seventh Circuit Court of Appeals concluded, first, that CSL

had at best a weak case for estoppel under the "private party litigation model," because CSL could not show a reasonable belief that § 1926(b) protection would not be asserted by the FmHA against its purchase of water from a source other than Jennings Water. *Id.* at 316–17. However, the court ultimately concluded that estoppel, in these circumstances, was not available because it would violate public policy. *Id.* at 317–18. The court's succinct conclusions were as follows:

> In this case, application of equitable estoppel based on Jennings' actions would allow a private contract for the sale of water between North Vernon and CSL effectively to trump section 1926(b). As discussed *supra*, the primary beneficiaries of section 1926(b)'s ban on association service curtailment are not the associations themselves, but rather, the FmHA and the individual rural consumers who would not have inexpensive and reliable water service without FmHA-supported rural water associations. *See generally [City of Madison, Miss. v.] Bear Creek Water [Ass'n, Inc.]*, 816 F.2d [1057,] 1060 [ (5th Cir. 1987) ].* Accordingly, Jennings' section 1926(b) action for injunctive relief cannot be barred by equitable estoppel.

*Jennings Water, Inc.*, 895 F.2d at 317–18.

This court's agreement with the principle established in *Jennings Water* is somewhat tepid in light of the facts of this case. First, although the party asserting estoppel in *Jennings Water* had at best a "weak" claim for estoppel, here, the City has an express agreement, not just lack of objection, to a specific trade of customers to resolve a dispute. Furthermore, the court agrees that the pertinent regulation, at least by its plain meaning, does not encompass a "customer" within the meaning of a "facility," and thus the City could reasonably have believed that such a trade was permissible without FmHA

---

7. The regulation to which the City cites provides, in pertinent part, as follows:

(2) Loan resolutions. Loan resolutions will be adopted by both public and other-than-public bodies using Form FmHA or its successor agency under Public Law 103–354 1942–47, "Loan Resolution (Public Bodies)," or Form FmHA or its successor agency under Public Law 103–354 1942–9, "Loan Resolution (Security Agreement)." These resolutions supple-

ment other provisions in this subpart. The applicant will agree:

 * * * * * *

(xii) Not to sell, transfer, lease, or otherwise encumber the facility or any portion thereof or interest therein, and not to permit others to do so, without the prior written consent of the Government.

7 C.F.R. § 1942.17(n)(2)(xii).

approval under the regulations and § 1926(b). Nonetheless, the overriding justification for the conclusion of the Seventh Circuit Court of Appeals that estoppel is no bar—that the public policy behind § 1926(b) should not be "trumped" by a private contract—is still persuasive here, and that principle bars application of estoppel at least where the public entity that is one of the primary beneficiaries of § 1926(b), the FmHA, is not a party to the agreement upon which the claim of estoppel is founded. Therefore, although the regulation cited by the City may not bar such a transfer of customers, the principles behind § 1926(b) do, at least where the FmHA is not a party to the agreement to transfer.

The upshot of this conclusion is that the City's acquisition of Vande Berg Scales, an existing customer of RWS # 1 although located within the City's limits, at a time when RWS # 1 was indebted to the United States, and thus could claim an existing customer as part of its protected service area under § 1926(b), constituted a "curtailment" of RWS # 1's service area in violation of § 1926(b).

### 3. Service and encroachment outside the 1989 boundary

The remaining questions are the extent of RWS # 1's protected service area *outside* of the City's limits as of July 1, 1992, and whether curtailments or threatened curtailments of RWS # 1's service area occurred in violation of § 1926(b) *after* July 1, 1992, when RWS # 1 again became indebted to the United States. The question of the extent of RWS # 1's protected service area *after* July 1, 1992, turns on RWS # 1's physical ability to serve its asserted service area *outside* of the City's 1989 city limits, and outside any additional areas incorporated into the city before July 1, 1992, and the City's encroachment upon any protected service area. The court has already determined, also in its summary judgment ruling, that RWS # 1 has the legal right to serve outside the City's limits as those boundaries existed on July 1, 1992, because the court held that the City could not assert a two-mile exclusionary zone *as against RWS # 1* outside the City's limits pursuant to IOWA CODE § 357A.2. The City has cited no other legal authority on its part superior to RWS # 1's to provide water service outside of the City's limits.

The customers in question, therefore, are any and all prospective customers outside of the City's limits as those limits stood on July 1, 1992—essentially the 1989 city limits with a few other small annexations—as well as existing customers including the three "Sneller" properties, and the residents of the Byl Subdivision. RWS # 1 argues that, as to each of these customers or group of customers, it had water lines through or adjacent to the properties—"pipe in the ground"—capable of providing service immediately or within a reasonable time, but the City curtailed that service by providing water instead. The City does not dispute that the Byl Subdivision and two of the three "Sneller" properties were annexed and received service from the City after RWS # 1 was again indebted to the United States. However, the City challenges the "adequacy" of the service available from RWS # 1 to these properties, on the basis of adequate capacity and pressure and on the basis of lack of fire protection. The City points out, further, that the Carriage House was annexed in 1990 when RWS # 1 was *not* indebted to the United States, and thus the City's service to the Carriage House was not a curtailment of RWS # 1's protected service area.

#### a. Matters of geography and timing

The court's consideration of whether the City has "curtailed" RWS # 1's protected service to these customers begins with matters of geography and timing: where are RWS # 1's "pipes in the ground" in relation to the properties in question, and when did the City annex the properties and/or begin providing water service to them in RWS # 1's stead. The question of "pipes in the ground" is easy, because RWS # 1 undeniably had service pipelines adjacent to or through each of these properties from as early as 1975 and certainly had such service lines in place on July 1, 1992. However, "pipes in the ground" is not enough if questions of timing establish that RWS # 1 had no legal right to serve the properties in question as of July 1, 1992. *See Rural Water Sys. # 1*, 967 F.Supp. at 1524 & 1527 & 1535.

■ As to the Carriage House, the court agrees that this property was not part of RWS # 1's service area when RWS # 1 regained the protections of § 1926(b) on July 1, 1992. At the time of the City's annexation of the Carriage House on October 1, 1990, and the commencement of City water service to it, RWS # 1 was not indebted to the United States. Therefore, the City's acquisition of this customer was not a curtailment of RWS # 1's service area in violation of § 1926(b). Nor was RWS # 1's claim to service of the Carriage House revivified, although it had "pipe in the ground" adjacent to or through this property, when RWS # 1 again became indebted to the FmHA, because RWS # 1 then had no legal right to serve the Carriage House, which by then lay within the City's limits and was legally served by the City. *See Rural Water Sys. # 1*, 967 F.Supp. at 1524 & 1527 & 1535 (requiring that the indebted association have both a legal right and physical ability to serve disputed territory). Therefore, the City's water service to the Carriage House is not a curtailment of RWS # 1's protected service area.

■ The remaining "Sneller" properties— Mrs. Sneller's property and the Vander Vegt property—as well as the Byl Subdivision, however, were both annexed by the City and began to receive water service from the City *after* RWS # 1 became re-indebted to the United States, and thus they were in RWS # 1's protected service area, at least as a matter of geography and timing, when the City acquired them as customers. Mrs. Sneller, however, had always received her water service from the City at her old house. City service to Mrs. Sneller's old house predated the existence of RWS # 1. The complication is that Mrs. Sneller moved the old house to a new location on the same parcel of land, and built a new house, which again was connected to City water. The question is whether Mrs. Sneller's new house, on the same parcel of land, was therefore also by rights a City customer or, instead, a "new" customer outside of the City's limits and within RWS # 1's service area, as to which RWS # 1 could claim the protections of § 1926(b).

The record is silent as to whether the "old" residence, in its new location on the same tract of land, has any water service at all.

However, the court finds that RWS # 1 has failed to prove that Mrs. Sneller's "new" house, apparently located where the "old" house formerly stood, is a different customer from her "old" house. Instead, the circumstance is the same as if the "old" house had burned down and been rebuilt. In such circumstances, there would be little question that Mrs. Sneller would be entitled to continue the utilities connections she had prior to the loss of the old house as the result of a calamity. In the alternative, because the City had always served the residential customer on the tract of land in question, the court concludes that the City retained the legal right to serve that residential customer on that tract of land, albeit at a new house, particularly when a new house was simply substituted for an old one, not added as an additional connection. Consequently, Mrs. Sneller's "new" house is not a "new" customer that RWS # 1 had a legal right to serve. Lacking such a legal right, RWS # 1 cannot assert that Mrs. Sneller's "new" house was within its protected service area when the City re-initiated or continued water service to it. *See Rural Water Sys. # 1*, 967 F.Supp. at 1524 & 1527 & 1535.

The Byl Subdivision and the Vander Vegt property, however, were both clearly new customers outside of the City's limits as of July 1, 1992, when the City annexed and commenced water service to them, in 1996 and 1997, respectively. The question of the legality of the City's service to these properties therefore is not one of geography or timing, but one of adequacy of the water service RWS # 1 could have provided to them.

#### b. Adequacy of service

As mentioned above, the City challenges the "adequacy" of the service available from RWS # 1 to these properties on the basis of adequate capacity and pressure and on the basis of lack of fire protection. The court will take the latter contention first.

■ *i. Fire protection.* The City notes that "[m]uch of the evidence in this case centers on the question of whether Rural Water can provide water for fire protection," Defendant's Post–Trial Brief, p. 10, but no-

where has the City cited any authority whatsoever for the proposition that a rural water association must provide adequate fire protection to obtain the protections of § 1926(b), or even identified any binding obligation on RWS # 1 to provide fire protection as the result of federal, state, or local statutes or regulations. To put it quite bluntly, "fire protection" is a red herring.

Indeed, the only court to consider the question directly—in a decision not cited or distinguished by the City in pre- or post-trial briefing—has rejected the contention that provision of fire protection is a requirement for § 1926(b) protection of service area. In *Rural Water Dist. # 3 v. Owasso Utilities Auth.*, 530 F.Supp. 818 (N.D.Okla.1979), the court also noted that, as here, "much time was expended and testimony elicited as to the adequacy of the Water District system for the purposes of fire protection." *Owasso*, 530 F.Supp. at 823. The court in *Owasso* dismissed the question even more bluntly than this court has:

> The Court finds that § 1926(b) of the Agricultural Credit Act, Title 7 U.S.C. § 1921 *et seq.*, was not enacted for the purposes of fire protection—it was enacted to provide means of securing a "safe and adequate supply of running household water." There is no evidence in the record that the Water District is not effectuating the purpose of the Statute with the implementation of its water system. . . .
>
> . . . There is nothing in the Act itself to preclude the Owasso Utilities Authority from maintaining a water line for the purposes of fire protection only. Section 1926(b) does not encompass such a purpose.

*Owasso*, 530 F.Supp. at 823; *see also North Shelby Water Co. v. Shelbyville Muni. Water and Sewer Comm.*, 803 F.Supp. 15, 23 (E.D. Ky.1992) ("The adequacy of the water service North Shelby is presently able to provide, including fire protection, is irrelevant to a determination whether North Shelby is entitled to the protections of § 1926(b)," citing *Owasso* ). Unreported decisions since *Owasso* have also concluded that a protected association was not required to provide fire protection, but that a municipality could provide fire protection only to an area otherwise served by a protected association without

violating § 1926(b). *See Glenpool Utility Serv. Auth. v. Creek County Rural Water Dist. No. 2*, 956 F.2d 277 (table opinion), 1992 WL 37327, *1 n. 4 (10th Cir.1992) ("It is clear that Glenpool has the right to provide fire protection in the area," citing *Owasso* ); *Water Works Dist. No. II of Tangipahoa Parish v. City of Hammond*, 1989 WL 117849, *6 (E.D.La.1989) (unpublished) ("Therefore, while the City will be enjoined from supplying water service to the areas as indicated in these findings and conclusions, the City shall have the right to maintain and use its water mains and pipelines for fire protection purposes.").

More generally, "[t]he overwhelming weight of authority is that the purpose of [§ 1926(b) ] is to protect rural water service users' access to *clean, safe water*," see *Wayne v. Village of Sebring*, 36 F.3d 517, 529 (6th Cir.1994) (emphasis added), *i.e.*, "a safe and adequate supply of running household water," *Jennings Water, Inc.*, 895 F.2d at 315 (quoting S. REP. NO. 566, 87TH CONG., 1ST SESS., reprinted in U.S. CODE CONG. & ADMIN. NEWS 2243, 2309 & 2305); *Bear Creek Water Ass'n, Inc.*, 816 F.2d at 1060 (also quoting the Senate Report). These decisions, and indeed the legislative history of § 1926(b), do not mention fire protection.

At oral arguments, the City contended that fire flow protection was nonetheless required for RWS # 1's service to be "adequate," because when the City annexed territory, the citizens in the annexed territory then had an expectation of water service meeting City standards, including fire flow protection, which RWS # 1's system could not fulfill. This argument is unavailing for at least two reasons. First, the City simply has no fire flow standards in place that could be imposed upon RWS # 1 at annexation. Thus, the City cannot establish that citizens had an expectation of water service meeting a certain City standard for fire flow protection, when no such City standard exists. Second, such an argument clearly circumvents § 1926(b), which provides that "[t]he service provided or made available through any such association *shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any munic-*

*ipal corporation* or other public body." 7 U.S.C. § 1926(b) (emphasis added). If a municipality could displace a rural water system simply by annexing territory and declaring that the rural water system did not then meet some City standard for service in the annexed area, the protection of § 1926(b) would be illusory, because the association's service would be curtailed or limited solely by inclusion of the area within the boundaries of the municipality.

The evidence regarding fire protection is irrelevant to this case and any inadequacy of RWS # 1's system to meet fire protection demands, when it was required and designed to provide only potable running water for household use, stands as no bar to RWS # 1's assertion of § 1926(b) protection.

■ *ii. Capacity, pressure, and storage.* The asserted inadequacy of the capacity and pressure of, and storage facilities for water available to serve the few remaining disputed customers, the Byl Subdivision and the Vander Vegt property, is therefore the City's only contention that RWS # 1 cannot invoke the protections of § 1926(b) as to them. As to capacity and pressure, the court is more sympathetic to the contention that more than simply "pipes in the ground" is required to obtain § 1926(b) protection, if the pipes in the ground manifestly cannot serve present needs and there is no likelihood that adequate service could be provided within a reasonable time. *Cf. Bell Arthur Water Corp.*, 972 F.Supp. at 962 (rejecting the argument that the only appropriate judicial consideration is the proximity of the water association's lines to the disputed area, and concluding instead that the court should consider necessary alterations to meet de-

mands and the financial ability of the association to make such alterations within a reasonable time).[8] However, the question is not whether objectively adequate service for all potential users can be provided immediately. As the court explained in the *North Shelby* decision,

> Resolution of questions as to the adequacy of water service to be provided is within the exclusive jurisdiction of the appropriate regulatory agencies, which in this case would include the PSC, and the local Planning and Zoning Commission. If North Shelby is incapable of providing the required level of service, the appropriate regulatory agencies are authorized to refuse to permit North Shelby to serve those areas. 7 U.S.C. § 1926(b) was not intended to make federal courts into regulatory agencies for rural water systems. As the legislative history for § 1926 indicates, the purpose of the FmHA loan program is to secure for rural residents "a safe and adequate supply of running household water." S. REP. NO. 566, 87TH CONG., 1ST SESS., Reprinted in 1961 U.S. CODE CONG. & ADMIN. NEWS 2243, 2309. As the evidence in this case clearly establishes, North Shelby has made such water service "available" to the subdivisions in question. Whether North Shelby can and should provide a greater level of water service is a decision entrusted to the authority of the appropriate state and local regulatory agencies. No agency has determined that North Shelby cannot or will not provide the required level of service.

*North Shelby Water Co.*, 803 F.Supp. at 23. The *North Shelby* court held that the proper question for the courts is whether the associ-

---

8. An unpublished decision is also in accord. In *Pittsburg County Rural Water Dist. No. 7 v. City of McAlester*, 1997 WL 835210 (E.D.Okla.1997), the district court opined as follows:

> If the quality of the lines and the ability of those existing lines to adequately service the disputed area are not also crucial to establishing whether an association ,makes service available, an absurd result can easily be contemplated. An association could merely demonstrate that it has in place a line of an obviously insufficient capacity and still be afforded the protection of § 1926(b). In the meantime while the association may or may not build its lines to accomodate [sic] the demands of the

disputed territory, the customers are left with inadequate water service to maintain their businesses with no assurance that adequate service will be restored. This Court must conclude that not only must a line be in place, but also that line must be capable of delivering water in sufficient quantities to service the disputed territory.

*Pittsburg County Rural Water Dist. No. 7*, 1997 WL 835210 at *6 (citing *Bell Arthur* in support of this conclusion, as well as this court's prior ruling in this case on the question of whether the 8-inch line across the southern part of the City was a dedicated transmission line or was available to service customers).

ation seeking protection "is capable of providing water service to the subdivisions within a reasonable time after application for service." *Id.* at 22 (citing *Glenpool,* 861 F.2d at 1213); *accord Bell Arthur Water Corp.,* 972 F.Supp. at 963 (citing *North Shelby* for the proposition that the question is whether adequate service can be provided within a reasonable time or with only minor adjustments to the system).

When arguments over the adequacy of the RWS # 1 system to maintain minimum pressure during maximum fire flow conditions are discounted, and all of the evidence, including the opinions of experts for both parties, is weighed,[9] it is apparent that RWS # 1 is now providing adequate service, in terms of pressure and capacity, to the Vander Vegt property and the Byl Subdivision. Although the City posed hypothetical questions concerning the adequacy of service to the Byl Subdivision if that development had involved forty lots instead of four, there is no indication in the record that such a large development is currently contemplated in that area. Even if it was, the undisputed testimony of Jean Still is that RWS # 1 has the financial resources and resolve to provide adequate service to such a large development within a reasonable time of application, in light of the fact that such a development would be, at this point, a long way from groundbreaking, which would allow RWS # 1 a substantial period of time to upgrade its system to meet the additional demand. Again, there is no evidence in the record that any customer or regulatory agency has ever complained that RWS # 1 is currently providing water with an inadequate flow or inadequate pressure anywhere in its system, let alone in proximity to the City, even if there are comparatively "low pressure" areas identified in the RWS # 1 system that RWS # 1 should address in its long term planning. Although the City's expert testified that RWS # 1's system does not meet storage capacity standards of the Iowa Department of Natural Resources (IDNR) "[i]n a system that does not provide fire service," Trial Transcript, pp. 640–41, the IDNR has not refused RWS # 1 any permits. The court will not be drawn further into questions that properly belong to regula-

tory authorities. *See North Shelby Water Co.,* 803 F.Supp. at 23.

RWS # 1 provides adequate service to the disputed territory within the meaning of § 1926(b) and pertinent regulations, as a matter of "pipes in the ground" and the actual capacity of those pipes to meet the needs of adjacent customers. Therefore, the City's connection of the Byl Subdivision and the Vander Vegt property constituted curtailment of RWS # 1's service area in violation of § 1926(b). Attempts by the City to provide service to other customers outside of the City's boundaries as they existed on July 1, 1992, would also violate or threaten to violate § 1926(b).

### C. State Law Claims

Although RWS # 1 has prevailed in part on its federal claim of curtailment of its service area in violation of § 1926(b), the court must also consider RWS # 1's state-law claims, because, for example, those claims may reach a broader range of the City's conduct. Specifically, although RWS # 1 lacked any federal protection for its service area between 1988 and July 1, 1992, RWS # 1 seems to assert that the City's conduct during that hiatus in federal protection ran afoul of state law. RWS # 1's three state-law claims allege tortious interference with prospective business advantage, conversion of property, and inverse condemnation. The court will consider these claims in turn.

#### 1. Tortious interference

 This court recently considered the elements of a claim of tortious interference with a prospective business advantage in *King v. Sioux City Radiological Group, P.C.,* 985 F.Supp. 869 (N.D.Iowa 1997). In *King,* this court identified the elements of the tort as follows:

1. The plaintiff had a prospective [contract or business relationship] with a [third person].

2. The defendant knew of the prospective relationship.

3. The defendant intentionally and improperly interfered with the relationship

---

9. The court does not reach the question of the admissibility of RWS # 1's "rebuttal" expert testimony, because that evidence need not be considered in reaching this conclusion.

by [set forth the particulars supported by the evidence].

 4. a. The interference caused [the third person] not [to enter into or continue] the relationship [or]

 b. The interference prevented the plaintiff from [entering or continuing] the relationship.

 5. The amount of damage.

*King*, 985 F.Supp. at 882 (citing Iowa Civil Jury Instructions, 1200.2, and citing generally *Nesler v. Fisher & Co., Inc.*, 452 N.W.2d 191, 199 (Iowa 1990); *Gordon v. Noel*, 356 N.W.2d 559, 563 (Iowa 1984); and *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 799 (Iowa 1984)); *accord Tredrea v. Anesthesia & Analgesia, P.C.*, 584 N.W.2d 276, 283 (Iowa 1998) (identifying essentially the same elements of the tort); *Iowa Coal Mining Co. v. Monroe County*, 555 N.W.2d 418, 438 (Iowa 1996) (same). Tortious interference with a prospective business advantage is a recognizable tort against a governmental subdivision, such as the City. *See Iowa Coal Mining Co.*, 555 N.W.2d at 436–37.

■ However, as both this court and the Iowa Supreme Court have observed, the element of intentional and improper interference requires that the tortfeasor be shown to have had as a purpose for its interference "to financially injure or destroy the plaintiff." *King*, 985 F.Supp. at 882 (citing *Burke v. Hawkeye Nat'l Life Ins. Co.*, 474 N.W.2d 110, 114 (Iowa 1991); *Nesler*, 452 N.W.2d at 199; *Page County Appliance Ctr., Inc. v. Honeywell, Inc.*, 347 N.W.2d 171, 177 (Iowa 1984); *Harsha*, 346 N.W.2d at 799; *First Med., Inc. v. Embassy Manor Care Ctr., Inc.*, 483 N.W.2d 14, 16 (Iowa Ct.App.1992)); *accord Tredrea*, 584 N.W.2d at 283 (" 'Interference with a prospective contract is an intentional tort which requires a showing that the sole or predominant purpose of the actor's conduct was to financially injure or destroy the plaintiff,' " quoting *Willey v. Riley*, 541 N.W.2d 521, 526 (Iowa 1995)); *Iowa Coal Mining Co.*, 555 N.W.2d at 438 ("Element number three requires proof that the defendant intended to financially injure or destroy the plaintiff."). More specifically, " '[t]here must be substantial evidence of a predominant motive by the defendant to terminate the contract for improper reasons.' " *King*, 985 F.Supp. at 883 (quoting *RTL Distrib.,*

*Inc. v. Double S Batteries, Inc.*, 545 N.W.2d 587, 590 (Iowa Ct.App.1996), in turn citing *Water Dev. Co. v. Board of Water Works*, 488 N.W.2d 158, 162 (Iowa 1992)). This is the point on which RWS # 1's proof as to this claim utterly fails.

■ The "predominant purpose" of the City's annexations in and after 1989 was simply not to drive RWS # 1 out of business; it was to draw contiguous areas within the City. It is far too great a stretch to draw an inference, let alone determine, from the legitimate exercise of eminent domain power to annex contiguous land that the City's goal was to destroy one competing utility that served a much larger area beyond the City's reasonably anticipated limits. *See King*, 985 F.Supp. at 883; *and compare Tredrea*, 584 N.W.2d at 284 (citing *Willey*, 541 N.W.2d at 527, for the proposition that if the defendant acts for two or more purposes, its improper purpose must predominate). Nor can the court conclude that any of the other actions by the City of which RWS # 1 has complained, such as mistaken assertion of a two-mile exclusivity zone outside of the City's limits, were somehow for the predominant purpose of destroying RWS # 1. *See id.* The record reveals, to the contrary, that the City had significant reasons to maintain RWS # 1 in existence, such as the contracts between the parties for water treatment and other joint uses of facilities, while assertion of the two-mile exclusivity zone and other actions of the City were simply to maintain what the City believed to be, albeit wrongly in some cases, its own rights. The City has made no attempt simply to condemn RWS # 1's facilities to put them to the City's exclusive use. For these reasons, based on complete lack of proof on an essential element, the City is entitled to judgment in its favor on this claim.

### 2. Conversion

■ "The civil equivalent of a theft prosecution is an action for conversion." *Iowa v. Taylor*, 506 N.W.2d 767, 768 (Iowa 1993) (citing *Kendall/Hunt Pub. Co. v. Rowe*, 424 N.W.2d 235, 247 (Iowa 1988)). This court also recently considered the nature and elements of a civil conversion claim. *See*

*Hanson v. Hancock County Mem. Hosp.*, 938 F.Supp. 1419, 1438–39 (N.D.Iowa 1996). As this court explained,

> Under Iowa law, which is based on Restatement (Second) of Torts § 222A, "[c]onversion is the act of wrongful control or dominion over another's personal property in denial of or inconsistent with that person's possessory right to the property." *Ezzone v. Riccardi*, 525 N.W.2d 388, 396 (Iowa 1994) (citing *Kendall/Hunt Pub. Co. v. Rowe*, 424 N.W.2d 235, 247 (Iowa 1988), and Restatement (Second) of Torts § 222A(1), at 431 (1965)), *cert. denied sub nom. Ezzone v. Hansen*, [514] U.S. [1108], 115 S.Ct. 1958 [, 131 L.Ed.2d 850] (1995); *McCray v. Carstensen*, 492 N.W.2d 444, 445 (Iowa Ct.App.1992) (also citing *Kendall/Hunt*); *Larson v. Great West Cas. Co.*, 482 N.W.2d 170, 173 (Iowa Ct.App. 1992) (also citing *Kendall/Hunt*, but not § 222A of the Restatement). Thus, no conversion may be found where the exercise of control was not wrongful. *Larson*, 482 N.W.2d at 173 (citing *Williams v. Redinger*, 179 Iowa 615, 616, 161 N.W. 701, 702 (1917)). Furthermore, liability for conversion may only be imposed when the intentional and wrongful interference with the property is so serious that the actor may justly be required to pay full value. *Kendall/Hunt*, 424 N.W.2d at 247; *McCray*, 492 N.W.2d at 445; *Larson*, 482 N.W.2d at 174. Citing § 222A of the Restatement, Iowa courts list the following factors as appropriate to consider whether the interference is sufficiently serious to find a conversion:
>
> (a) the extent and duration of the actor's exercise of dominion or control;
>
> (b) the actor's intent to assert a right in fact inconsistent with the other's right of control;
>
> (c) the actor's good faith;
>
> (d) the extent and duration of the resulting interference with the other's right of control;
>
> (e) the harm done to the chattel;
>
> (f) the inconvenience and expense caused to the other.
>
> *Kendall/Hunt*, 424 N.W.2d at 247; *McCray*, 492 N.W.2d at 445; *Larson*, 482 N.W.2d at 174.

*Hanson*, 938 F.Supp. at 1438–39. It appears that RWS # 1 asserts that the City has "converted" customers and prospective customers, at best intangible property rights, as well as physical facilities.

■ Considering the elements of a civil conversion claim and the evidence presented at trial, it is also clear that RWS # 1 cannot prevail on this claim. First, RWS # 1 has failed to prove that the City's annexations, the conduct upon which RWS # 1's conversion claim in part relies, were "wrongful" as required for the conversion claim to lie. *See id.* The court concludes from the record presented here that the annexations were proper exercises of governmental power for legitimate governmental purposes. Thus, incidental interferences with RWS # 1's property rights as the result of annexation are not actionable as conversions. Although the City's reliance on the supposed two-mile exclusivity zone outside of the City may have been "wrongful," or at least erroneous, RWS # 1 has failed to prove that it actually lost, that is, that the City "converted," any customers as the result of assertion of that exclusivity zone. Rather, on each occasion that RWS # 1 approached the City to see which entity should serve an outlying customer, it appears that the City allowed RWS # 1 to serve that customer.

Yet, even supposing there was "wrongful" conduct by the City and that the conduct resulted in interference with RWS # 1's property rights, and supposing further than RWS # 1 has a property right in intangible property such as prospective customers as to which a conversion claim will lie, *see Hanson*, 938 F.Supp. at 1439 (identifying the limited kinds of "intangible" property interests to which a conversion claim can be applied), RWS # 1's conversion claim ultimately founders on the factors for weighing whether "the interference is sufficiently serious to find a conversion." *Id.* at 1438–39.

As to the first of these factors, the extent and duration of the actor's exercise of dominion or control, *see id.*, it is apparent that where the City has annexed property and served customers it was not entitled to serve, RWS # 1's displacement as the water service entity is permanent; however, the City's ex-

ercise of dominion and control over RWS # 1's physical facilities is nil. The City has never condemned, disturbed, or interfered with the function of any portion of RWS # 1's pipeline that eventually came within City limits and RWS # 1 maintains control, and runs water through, all of its facilities. As to the second factor, assertion of rights inconsistent with the claimant's, *see id.,* the City has indeed asserted a right to serve customers that is inconsistent with RWS # 1's asserted right to serve them, but again, the City has not asserted any right to physical control of RWS # 1's physical facilities, even where those physical facilities lie within the City's boundaries. Furthermore, the court cannot find but that the City's conduct was in "good faith," *see id.* (third factor), although the City's conduct was at times based on an erroneous assertion of statutory rights to an exclusivity zone this court has only just recently debunked.

Perhaps most persuasive to the court is the question of the extent and duration of the resulting interference with RWS # 1's right of control, the fourth factor in the analysis. *See id.* Although the City has effectively deprived RWS # 1 of all prospective customers within its boundaries, and RWS # 1's physical facilities are no longer useable to serve such prospective customers, *RWS # 1 retains a right to serve all customers outside of the City's boundaries and retains a right of control over all of its physical facilities, and still further those facilities remain fully useable to serve customers outside of the City's borders.* It is fruitless to complain, as RWS # 1 does, that the investment in facilities will not be fully realized, because RWS # 1 cannot serve customers on both sides of the City's boundaries, because that simply means the existing facilities will be sufficient to serve customers outside of the City's boundaries for a longer period of time. As a matter of common sense, and in light of the expert testimony concerning capacity of the RWS # 1 system, there is a finite number of taps that can be served off of RWS # 1's existing facilities. It matters not at all to the value of the investment in existing facilities whether those taps serve properties inside or outside of the City's boundaries. In short, the loss of more immediate gains in revenue from drawing upon growth of customers within the City's boundaries is offset by the longer period of time before an investment in additional facilities will be required to service new customers outside of the City's boundaries. Similarly, in those few locations where the number of properties that can be served off of an existing RWS # 1 line has been effectively "capped" by the City's annexation,[10] RWS # 1 had an obligation to serve the existing customers at the time they were added, pursuant to § 1926(b) and federal regulations, as customers who could legally and feasibly be served, without regard to whether there would be any more such customers served off the same line. One oddity is the 2–inch line installed parallel to the 8–inch transmission line, which now will never serve any customers. The conclusion as to this line, however, is ultimately no different, because Jean Still's testimony identifying the reasons for installing that line clearly demonstrated that RWS # 1 balanced the fact that the line was not immediately going to serve anyone against the difficulties of installing it across a federal highway on a later occasion if service in the area was ultimately needed. This testimony simply demonstrates that RWS # 1 accepted the gamble on the ultimate usefulness of the 2–inch line and its cost of installation sooner versus its cost if installed later, and lost on the gamble.

To complete the analysis of pertinent factors, the court cannot find that any "harm" has been done to RWS # 1's physical chattels. *See id.* (fifth factor). As to physical facilities, all remain operational and undisturbed by the City. The court recognizes that RWS # 1's intangible "chattels" have been "harmed" to the extent that RWS # 1's inter-

---

**10.** Such locations include the following 2–inch service lines, beginning in the north and moving clockwise: the line parallel to U.S. Highway 75 serving two existing customers within the City's northern boundary; the line parallel to East 1st Street serving one customer inside the City's eastern boundary; and a 2–inch line servicing customers within the southernmost part of the City's 1989 boundaries just south of 410th Street/ 20th Street S.W. In addition, the 3–inch service line running south from 410th Street parallel to U.S. Highway 75, which serves only one customer within the City's 1989 boundaries, continues on south and is available to serve customers outside of the City's boundaries.

est in such customers has been destroyed, but the court does not believe this "harm" to intangible interests outweighs the lack of harm to physical chattels. Furthermore, as to the inconvenience and expense caused to RWS # 1, *see id.* (sixth factor), the court is at a loss to discover in the record any real inconvenience or expense RWS # 1 has incurred as the result of the City's actions. Certainly, RWS # 1 has not been required to remove or reroute any of its water lines and there is no evidence presented that RWS # 1 has been put to any additional expense for any other reason. Jean Still further testified that RWS # 1's ability to repay its loans and to fund operations and improvements has not been impaired.

For these reasons, the court concludes that RWS # 1 has failed to prove its "conversion" claim. The City is therefore entitled to judgment in its favor on this state-law claim as well.

### 3. *Inverse condemnation*

 RWS # 1's last state-law claim is for "inverse condemnation." Again, as the basis for this claim, RWS # 1 seems to assert that both prospective customers and physical facilities have been "taken" without just compensation. "The term 'inverse condemnation' is a generic description of the manner in which a landowner recovers just compensation for a taking of a property owner's property when condemnation proceedings have not been instituted." *Iowa Coal Mining Co. v. Monroe County,* 555 N.W.2d 418, 431 (Iowa 1996); *Schaller v. Iowa,* 537 N.W.2d 738, 743 (Iowa 1995); *Bellon v. Monroe County,* 577 N.W.2d 877, 879 (Iowa Ct.App. 1998) ("inverse condemnation" is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted"). Although the court suggested that there might be a question as to whether RWS # 1's assertion of inverse condemnation was proper in light of finality and exhaustion requirements for such a claim articulated by the Iowa Supreme Court in *Bakken v. City of Council Bluffs,* 470 N.W.2d 34 (Iowa 1991), and more recently in *Iowa Coal Mining Co.,* 555 N.W.2d at 431–34, the court will assume finality and exhaustion requirements have

been met, because the court concludes that the claim cannot succeed on its merits.

 "An essential element of inverse condemnation is that there is a taking of property." *Schaller,* 537 N.W.2d at 743; *Water Dev. Co.,* 488 N.W.2d at 160. The Iowa Supreme Court has explained further:

A taking does not necessarily require a transfer of physical control over the property but there must be a "loss of some compensable interest." [*Water Dev. Co.,* 488 N.W.2d at 160]. A taking exists if there is a substantial interference with the use and enjoyment of the property. *Hunziker [v. Iowa],* 519 N.W.2d [367,] 369 [ (Iowa 1994) ]. The character of the intrusion, however, and not the amount of damages determines whether a taking has occurred. *Phelps v. Board of Supervisors,* 211 N.W.2d 274, 277 (Iowa 1973).

*Schaller,* 537 N.W.2d at 743. In *Schaller,* the Iowa Supreme Court found a "taking," even though the owner was compensated for damages when the county acquired a road easement, because subsequent use of the road substantially deprived the property owner of the use and enjoyment of the property. *Id.* at 743–44.

The decision of the Iowa Supreme Court in *Water Development Company,* 488 N.W.2d at 160–61, is on point here. In that case, the City of Des Moines annexed part of Polk County southwest of the city in which Water Development Company (WDC), a private corporation, had previously been the sole supplier of water. *Water Dev. Co.,* 488 N.W.2d at 159. After annexation, the Des Moines Water Works replaced WDC as sole supplier of water for the area, but did not buy up WDC's existing facilities, instead installing its own water system. *Id.* Further pertinent findings of fact were the following:

At the time of the annexation, WDC served approximately forty-five customers in the annexed area. The water works now serves all of the customers in the annexed area, but presumably WDC continues to serve customers in the remainder of its territory.

*Water Dev. Co.,* 488 N.W.2d at 159.

The Iowa Supreme Court rejected WDS's inverse condemnation claim, finding there

had been no "taking." *Id.* at 160. The court observed that "[i]n this case, none of WDC's pipelines or other fixed assets have been seized or physically impaired, nor have there been any regulations imposed by the water works limiting WDC's use of the system." *Id.* Instead, the court found that "[w]hat has been lost to WDC is its status as the sole supplier of water to the residents of the area." *Id.* Ultimately, the court concluded that this loss was insufficient to support a "taking" claim:

> Here, WDC had no exclusive right to furnish water to the annexed area, nor did it have a right to be free from competition. Any "taking" of its business through lawful competition was not compensable as an inverse condemnation.

*Water Dev. Co.*, 488 N.W.2d at 161.

Similarly, RWS # 1 had no "exclusive right" to furnish water inside the City's 1989 city limits, because at the time of annexation, RWS # 1's service to the annexed area was not protected by § 1926(b). RWS # 1 has even less to complain about than did WDC, because, unlike WDC, RWS # 1 has maintained nearly all of the customers it previously had within the City's 1989 limits, *compare Water Dev. Co.*, 488 N.W.2d at 159 (WDC lost all of its customers within the annexed area), with the exception of customers "sold" in 1991 during the hiatus in RWS # 1's § 1926(b) protection and the subsequent "trade" of Vande Berg Scales in 1994, which this court has found did violate § 1926(b). However, even if the "trade" of Vande Berg Scales violated § 1926(b), it was not a "taking," because the exchange was voluntary and there was an agreement on the compensation RWS # 1 was to receive, the right to serve Tom Sandbulte. Like WDC, RWS # 1 retains all of the customers it had outside of the annexed area. *Compare Water Dev. Co.*, 488 N.W.2d at 159. Any "taking" of RWS # 1's customers by the City through lawful annexation and competition is not compensable as an inverse condemnation. *Id.* at 161.

Nor has there been any "taking" of RWS # 1's physical assets within the annexed territory, or anywhere else, because none of RWS # 1's pipelines or other fixed assets have been seized or physically impaired, and no regulations have been imposed by the City limiting RWS # 1's use of

its system. *Compare id.* at 160. For essentially the same reasons the court could find no "conversion" of RWS # 1's physical assets, there has been no "taking" by the City of those assets. RWS # 1 has suffered no loss of use or enjoyment of its physical assets, *see Schaller*, 537 N.W.2d at 743 (defining a taking, in part, as interference with use and enjoyment of property), even if that use must be somewhat redirected to serve customers exclusively outside instead of inside and outside of the City's limits. RWS # 1 is making precisely the same use of its facilities, to the same extent, as it was before any action by the City: it is serving rural water customers. The "character of the intrusion" upon RWS # 1's facilities resulting from redirection of use to customers on one side of the line instead on both sides is slight, at best. *Id.*

Therefore, the City is also entitled to judgment in its favor on RWS # 1's inverse condemnation claim.

### D. Remedies

Because RWS # 1 has prevailed, to some extent, on its federal claim of curtailment in violation of § 1926(b), the court must consider the question of what remedies RWS # 1 is entitled to receive. RWS # 1 specifically seeks declaratory relief, creation of what it calls a "constructive trust" that would transfer the City's curtailing facilities to RWS # 1, and money damages in the amount of $11,339.00 as the value of each past, present, and future customer, as well as litigation costs pursuant to 42 U.S.C. § 1988. Presumably, RWS # 1 seeks some of these remedies in the alternative. RWS # 1 concedes, however, that it can find no case in which a court has awarded money damages for a violation of § 1926(b). The City, asserting it is entitled to prevail on all claims, has not offered contrary evidence or arguments on the remedies to which RWS # 1 might be entitled if it prevailed on any claim.

Plainly the parties are entitled to declaratory and injunctive relief defining their respective service areas, and prohibiting either from infringing or encroaching upon the other's, in light of this court's summary judgment ruling and the present ruling after trial on the merits. *See, e.g., North*

*Alamo Water Supply Corp. v. City of San Juan, Tex.*, 90 F.3d 910, 917 (5th Cir.1996) ("Section 1926(b) does not create or specify a remedy for the enforcement of violations, but an injunction has been the principal tool employed by the courts with which to enforce the statute and prevent violations," citing *Bear Creek Water Ass'n, Inc.*, 816 F.2d at 1059, and *Jennings Water, Inc.*, 895 F.2d at 315), *cert. denied,* —— U.S. ——, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996). The more difficult question is whether, in order to rectify the curtailment of RWS # 1's service area in violation of § 1926(b) as to the three customers or areas the court has identified—Mr. Vander Vegt, the Byl Subdivision (two existing customers currently served by the City), and Vande Berg Scales—the court should also award money damages pursuant to 42 U.S.C. § 1983, or order the disconnection of City water and reconnection of RWS # 1's service, or some combination of remedies.

RWS # 1 asserts that the *North Alamo Water Supply Corporation* decision also supports its claim for a "constructive trust," *i.e.,* transfer of improper City connections to RWS # 1. In that decision, the Fifth Circuit Court of Appeals wrote,

> The City argues that the district court abused its discretion when it ordered the City to relinquish the water service infrastructures to the Utility because the relief was unrequested and if granted would prejudice the City. Citing *International Harvester Credit Corp. v. East Coast Truck*, [547 F.2d 888, 891 (5th Cir.1977),] the City insists that when the failure to demand the relief granted prejudices the opposing party, the district court abuses its discretion.
>
> *We conclude that in ordering the transfer of the infrastructures to the Utility, the district court did not abuse its discretion. Rule 54(c) vests district courts with broad discretion to fashion a remedy, even if the remedy awarded is not specifically requested in the prayer for relief.* Although we recognize that *Harvester* places some limits on the district court's discretion, those limits are modest indeed and clearly were not exceeded here. The law gives the Utility the exclusive right to provide water service to and within the disputed areas. We are under the impression that

the developers of the subdivisions installed the infrastructures and ceded them to the City without charge. The infrastructures are indispensable to providing water service to the residents of the subdivisions now that the development is complete. Thus, unless the infrastructures are transferred, the Utility would not be able to provide efficient and economical water service, and the rights of the Utility that are validated here would be useless.

*North Alamo Water Supply Corp.,* 90 F.3d at 918–19 (emphasis added). Although this court finds that it is not essential "infrastructures" that must be transferred in this case, but simply connections to specific customers, the *North Alamo Water Supply Corporation* decision is nonetheless instructive on the discretion of the court to remedy a violation of § 1926(b) by ordering the transfer of water service to the party who has the right, pursuant to § 1926(b), to serve particular customers. *See id.* This court also finds that, unless such a transfer is ordered, the rights of RWS # 1 that are validated here would be useless. *Id.* Therefore, the court will order the disconnection of City water service to Mr. Vander Vegt, any and all customers in the Byl Subdivision (only two of which currently exist), and Vande Berg Scales, and the connection of these customers to RWS # 1.

Furthermore, the decision of the Fifth Circuit Court of Appeals is also instructive on the manner in which the court should accomplish the transfer. *See id.* at 917. Although the defendant city in that case complained that the court's injunction requiring transfer of service was not sufficiently specific to satisfy FED. R. CIV. P. 65(d), the Fifth Circuit Court of Appeals disagreed:

> [T]he City complains that the district court's judgment fails to satisfy the requirements of Rule 65(d). In the form of a laundry list of specious quibbles and rhetorical questions, the City urges that the injunction is vague, unclear, and imprecise. We find none of these flaws to be present. The injunction is sufficiently and reasonably detailed and specific to permit the transfer of water service from the City to the Utility. Transferring water service from the City to the Utility will be a

relatively complicated logistical task, requiring a coordinated effort by both parties. The burdens of any disruption in service will fall more heavily on the residents than on the parties. *With an eye on these potential pitfalls, the district court instructed the City to continue uninterrupted water service until the Utility is prepared to commence service, then to cease providing water service immediately upon commencement of service by the Utility.* Although this order does not choreograph every step, leap, turn, and bow of the transition ballet, it specifies the end results expected and allows the parties the flexibility to accomplish those results. Like the district court, we trust that, despite their differences regarding the right to service the disputed areas, the parties will work together to achieve a smooth transition with no interruption in water service and a minimum of inconvenience to the residents of the disputed areas.

*North Alamo Water Supply Corp.,* 90 F.3d at 917 (emphasis added). Although disconnection of City water and connection of RWS # 1 service in this case is unlikely to be "a relatively complicated logistical task," it will nonetheless involve "burdens of ... disruption in service [that] will fall more heavily on the residents than on the parties." *Id.* Therefore, this court also will not attempt to "choreograph every step, leap, turn, and bow of the transition ballet," but will simply "specif[y] the end results expected": The City will be instructed to continue uninterrupted water service to the customers identified until RWS # 1 is prepared to commence service, then to cease providing water service immediately upon commencement of service by RWS # 1. *Cf. id.* Like the courts in *North Alamo Water Supply Corporation,* this court "trust[s] that, despite their differences regarding the right to service the disputed areas, the parties will work together to achieve a smooth transition with no interruption in water service and a minimum of inconvenience to the residents of the disputed areas." *Id.*

The court would deem it appropriate, despite the lack of other authority directly supporting a money damages award for violation of § 1926(b), to award such damages pursuant to § 1983 to compensate RWS # 1 for the period in which it was wrongfully deprived of the opportunity to serve the specified customers. However, there is a lack of proof as to what damages would be appropriate. The money damages calculation offered by RWS # 1 is for $11,339.00 as the value of each past, present, and future customer for the twenty-year period of RWS # 1's indebtedness. However, this calculation does not address the different times at which specific "curtailments" occurred, that of Vande Berg Scales in 1994, the Byl Subdivision in 1996, and Mr. Vander Vegt in 1997, or their relative durations. Nor is the court able reasonably to ascertain from the calculations proffered what damages should be awarded for the more limited periods the court finds might be appropriate, from curtailment until reconnection. In light of this lacuna in the proof, and the lack of any authority directly supporting an award of money damages to remedy violations of § 1926(b), the court will award no money damages.[11]

The court also finds the factual predicates for any award of punitive damages have not been proved and no such damages will be awarded. Finally, the court will reserve for later consideration the appropriateness and amount of any award for litigation costs pursuant to 42 U.S.C. § 1988 until there has been a proper submission in support of such an award. *See* N.D. IA. L.R. 54.1 & 54.2.

### III. CONCLUSION

Upon the hearing of all evidence and arguments of the parties, it is ordered, declared, adjudged, and decreed as follows:

1. The service area of RWS # 1 in reasonable proximity to the City of Sioux Center that is protected by 7 U.S.C. § 1926(b) consists of those water customers of RWS # 1

---

11. RWS # 1 cannot properly claim money damages for the cost of connecting or reconnecting the customers the court will order transferred to it, because RWS # 1 would have incurred the expenses of connecting these customers if they had been allowed to connect them in the first place.

that existed as of July 1, 1992, within the City's boundaries as of July 1, 1992, and all territory and all water customers outside of the City's boundaries as of July 1, 1992, excluding only those customers outside of those boundaries that the City was serving with water as of July 1, 1992, and the City's wastewater treatment plant. The City is enjoined from soliciting or connecting water customers within RWS # 1's service area so specified, or otherwise encroaching upon, or curtailing or limiting in any manner this service area during the term of RWS # 1's continued indebtedness to the United States.

2. RWS # 1 has no right or authority to serve customers within the boundaries of the City as those boundaries existed on July 1, 1992, with the exception of RWS # 1's customers existing within those boundaries as of that date.

3. The City's provision of water service to Mr. Vander Vegt, any and all customers in the Byl Subdivision, and Vande Berg Scales constitutes a curtailment or limitation of RWS # 1's protected service area in violation of 7 U.S.C. § 1926(b). The City is enjoined from continuing to provide water service to Mr. Vander Vegt, any and all customers in the Byl Subdivision, and Vande Berg Scales, and shall transfer such service to RWS # 1. The City is enjoined to allow and facilitate the connection of these customers to RWS # 1. The City is further enjoined to continue uninterrupted water service to the customers identified until RWS # 1 is prepared to commence service, then to cease providing water service immediately upon commencement of service by RWS # 1.

4. The court finds in favor of the defendant City of Sioux Center on RWS # 1's claims of tortious interference with prospective business advantage, conversion of property, and inverse condemnation. RWS # 1 shall take nothing on these claims.

**IT IS SO ORDERED.**